JOSEPH LUPOWITZ SONS. INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Joseph Lupowitz Sons, Inc. v. Commissioner
Docket Nos. 2753-70, 2755-70, 2756-70, 2757-70, 2758-70.
United States Tax Court
T.C. Memo 1972-238; 1972 Tax Ct. Memo LEXIS 19; 31 T.C.M. (CCH) 1169; T.C.M. (RIA) 72238; November 29, 1972, Filed John Y. Merrell and Richard P. Buskell, for the petitioners. John J. Weiler, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' income taxes: Taxable year
Docket No.
Petitioners
ending
Deficiency
2753-70
Joseph Lupowitz
7/31/65
$44,540.59 l
Sons, Inc.
7/31/66
60,739.86
2755-70
Albert Kauffman
12/31/65
3,591.46
and Martha
12/31/66
1,730.73
Kauffman
2756-70
Harold B. Lupowitz
12/31/65
6,228.20
and Sophie
12/31/66
540.65
Lupowitz
2757-70
Esther Meisler
12/31/65
2,367.45
2758-70
Leo C. Meisler
12/31/66
14,182.99
and Esther
Meisler
Concessions having been made by both the petitioners and the respondent, [2] the issues remaining for decision are: (1) Whether petitioner Joseph Lupowitz Sons, Inc., realized interest income on certain advances it made to Penn Wynn, Inc., a related *22 corporation. Should we hold that the corporate petitioner did realize such income, then it is liable for the personal holding company tax under section 541. [3]
(2) Whether petitioners Harold B. Lupowitz and Esther Meisler received a constructive dividend when Mansfield Homes, Inc., all of whose stock they owned, transferred funds to the corporate petitioner, about two-thirds of whose stock they also owned. GENERAL FINDINGS OF FACT The facts stipulated by the parties are incorporated herein by this reference. Petitioner Joseph Lupowitz Sons, Inc., is a pennsylvania corporation and had its principal office in Philadelphia, Pennsylvania, at the time it filed its petition herein. It filed Federal income tax returns on the accrual basis for the taxable years ended July 31, 1965 and July 31, 1966 with the district director of internal revenue, Philadelphia, *23 Pennsylvania. Petitioners Harold B. Lupowitz and Sophie Lupowitz are husband and wife, who, at the time of filing their petition herein, resided in Melrose Park, Pennsylvania. They filed a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue, Philadelphia, Pennsylvania. Sophie Lupowitz is a party to this action solely by reason of having filed the joint return with her husband. Petitioner Esther Meisler resided in Moorestown, New Jersey, at the time she filed her petition herein. In 1965, she was a widow named Esther Lupowitz and filed a Federal income tax return for the calendar year with the district director of internal revenue, Philadelphia, Pennsylvania. Issue 1. Interest Income FINDINGS OF FACT Joseph Lupowitz was the founder and chief executive officer of Joseph Lupowitz Sons, Inc. (hereinafter Lupowitz) from its organization in 1947 until his death on July 31, 1958. After his death, the outstanding capital stock of Lupowitz and its shareholders were as follows: Number of shares
Shareholder
Class A
Class B
Sidney Lupowitz
57-1/2
468
Emanuel Lupowitz
57-1/2
468
Martha Lupowitz Kauffman
57-1/2
468
Harold B. Lupowitz
57-1/2
468
Ten separate inter vivos trusts established by Joseph Lupowitz for the benefit of his grand- children
220
Total outstanding shares
230
2,092
*24 Both classes of stock were identical except that voting rights were vested exclusively in the class A stock. Sidney, Emanuel, Martha, and Harold were the children of Joseph. Following the death of Joseph, the officers and directors of Lupowitz were: Directors Sidney Emanuel
Martha Harold Officers President - Sidney Secretary - Martha Treasurer - Sidney In 1958, the Lupowitz family was planning the construction and operation of a new apartment building. In accordance with the previous business practice of the Lupowitz family, it was decided to form a separate corporation to limit the liability of the new apartment project. Penn Wynn, Inc. (hereinafter Penn Wynn) was therefore incorporated on February 4, 1959 for the purpose of constructing and operating a high-rise apartment building in Philadelphia, Pennsylvania. Penn Wynn kept its books and records and filed income tax returns, using the accrual method of accounting, for taxable years ending January 31. Its authorized capital was 500 shares of common stock with a par value of $100 per share. On February 24, 1959, Sidney, Emanuel, Martha, and Harold each paid $2,500 to Penn Wynn for 25 shares of its stock. *25 In addition to being the only shareholders of Penn Wynn, Sidney, Emanuel, Martha, and Harold were also the directors and officers of the corporation. Sidney was president, Harold vice president, Martha secretary, and Emanuel treasurer. Sidney died on July 20, 1960. On January 4, 1962, Lupowitz and Penn Wynn each redeemed all of its own stock held by Sidney's estate. Emanuel died on December 8, 1963. His widow, Esther Lupowitz, inherited all of Emanuel's stock in Lupowitz and Penn Wynn. From that time through the date of the filing of the petitions herein, there were no further changes in the stock ownership of either Lupowitz or Penn Wynn. Following the death of Sidney, the boards of Lupowitz and Penn Wynn were each reduced from four to three directors. The surviving Lupowitz brothers and sister continued as the only directors and officers of the two corporations. Following Emanuel's death and up to the time the petitions herein were filed, the directors of both Lupowitz and Penn Wynn were Harold, Martha, and Esther. For the same period the officers of the two corporations were as follows: Lupowitz
Penn Wynn
President
Esther
Harold
Vice President
Harold
Esther
Secretary
Martha
Martha
Treasurer
Harold
Esther
*26 On February 24, 1959, Lupowitz transferred $73,000 to Penn Wynn. The next day, Penn Wynn purchased for $80,000 a tract of land in Philadelphia as a site for constructing the new apartment building, which was to be called Penn Wynn House. By July 31, 1959, Lupowitz had transferred to Penn Wynn an additional $71,500. To record these advances, Lupowitz debited an account designated "Exchange" and Penn Wynn credited a like account in its ledger. Penn Wynn applied to a mortgage broker for a permanent mortgage loan covering the aforementioned tract of land and the high-rise apartment building to be constructed thereon. On February 9, 1960, John Hancock Mutual Life Insurance Company (Hancock) issued a mortgage loan commitment to Penn Wynn in the amount of $2,600,000 at 6-1/4 percent interest and for a term of 256 months. Hancock's commitment was conditioned on Penn Wynn's obtaining, within two months, a construction loan from an interim lender. As part of an application for such a loan, Penn Wynn submitted certain financial statements to Frankford Trust Company (Frankford). Included among the financial statements submitted to Frankford were the balance sheets as of July 31, 1959 of *27 Penn Wynn, Lupowitz, and a number of other business enterprises in which the Lupowitz family had a substantial ownership interest. Among the current assets of Lupowitz was listed an item designated "Loans Receivable - Penn Wynn, Inc $144,500." Among the liabilities of Penn Wynn was listed the correlative item "Loans Payable - Joseph Lupowitz Sons, Inc $144,500." On March 25, 1960, Frankford agreed to grant Penn Wynn the construction loan. Frankford's commitment letter provided, however, that no disbursements would be made out of the loan until Penn Wynn first applied some $543,000 of its own money toward the construction costs of Penn Wynn House. On April 13, 1960, Penn Wynn executed a note and mortgage to Frankford for a loan in the amount of $2,600,000 with interest at 6-1/4 percent annually and for a term of 256 months. From February 24, 1959 through August 8, 1960, Lupowitz transferred $575,000 to Penn Wynn. Penn Wynn's only transfer of funds to Lupowitz during this period was on May 4, 1960 in the amount of $7,000. These transfers were entered in the respective ledgers of Lupowitz and Penn Wynn under the accounts designated "Exchange." By August 8, 1960, Penn Wynn had applied *28 the required amount of its own funds (most of which came to Penn Wynn as advances from Lupowitz) toward the construction of Penn Wynn House. Frankford, pursuant to its commitment letter, then began to make periodic disbursements from its loan to cover the construction costs of Penn Wynn House. On November 28, 1961, Penn Wynn's liability to Frankford under the construction mortgage was replaced with a liability to Hancock under the permanent mortgage. Because the rental income generated by Penn Wynn House fell short of the original estimate, Hancock and Penn Wynn agreed to reduce the amount of the permanent mortgage loan to $2,450,000. The following table summarizes those transfers of funds between Lupowitz and Penn Wynn during the years indicated which were recorded by each corporation in its ledger under the "Exchange" account: Year Ended
From Lupowitz
From Penn Wynn
Balance outstand-
July 31
to Penn Wynn
to Lupowitz
ing at end of year
1959
$144,500
$ --
$ 144,500
1960
411,000
7,000
548,500
1961
58,000
53,500
553,000
1962
42,000
10,000
585,000
1963
12,500
30,000
567,500
1964
55,000
60,000
562,500
1965
87,000
56,000
593,500
1966
17,500
27,500
583,500
*29 Lupowitz reported the balances listed above as assets on Schedule L of its Federal income tax returns for the taxable years 1959 through 1966, variously described as "Advances to Other Companies," "Due from Affiliated Companies," and "Notes and accounts receivable." Penn Wynn reported such balances as liabilities on Schedule L of its tax returns for its taxable years 1959 through 1966 and included them in an item designated as "Bonds, notes, and mortgages payable (maturing less than one year from date of balance sheet)." At no time was there any express agreement or understanding between Lupowitz and Penn Wynn regarding the repayment of the transferred funds or the payment of interest with respect thereto. It was a frequent practice among the business enterprises owned by the Lupowitz family for one company to transfer available funds to another company which needed them without any discussion as to terms of repayment or interest. Lupowitz had reported no interest income from Penn Wynn in its returns for fiscal years 1960 or 1961. Upon an audit of those returns, the Internal Revenue Service, on November 12, 1962, proposed additions to the gross income of Lupowitz for the taxable *30 years 1960 and 1961 in the respective amounts of $20,087.50 and $22,615.00, stating that the purpose of the adjustments was "to include into income, interest on loan to affiliated corporation." A 5-percent rate of interest was used in computing the adjustments. Lupowitz consented to these adjustments and paid the resulting deficiencies in income tax. Lupowitz thereafter included accrued interest income (at the rate of 5 percent) from Penn Wynn in its tax returns for its fiscal years 1963 through 1966. The tax returns of Lupowitz for its taxable years 1962, 1963, and 1964 were examined by a revenue agent in 1965. On August 25, 1965, the Internal Revenue Service proposed a $24,455.00 addition to the gross income of Lupowitz in the taxable year 1962, again explaining that the purpose of the adjustment was "to include interest income on loan to affiliated company." As before, a 5-percent rate of interest was used. No changes were proposed for the taxable years 1963 and 1964. Lupowitz consented to the adjustment and paid the resulting deficiency for 1962. In its tax returns for the fiscal years 1960, 1961, and 1962, Penn Wynn claimed no deduction for the interest payable to Lupowitz. *31 Upon an audit of these returns, the Internal Revenue Service, on November 4, 1963, proposed adjustments for 1961 and 1962 "to allow interest expense as a result of revenue agent's adjustments to the related corporation of Joseph Lupowitz Sons, Inc." No overpayment resulted because Penn Wynn had a net loss for each of those years. No adjustment was proposed for Penn Wynn's taxable year 1960. Penn Wynn thereafter claimed deductions for interest expense (at the rate of 5 percent) accrued in favor of Lupowitz in its tax returns for the fiscal years 1963 through 1966, thereby increasing its net operating loss or decreasing its income for each of those years. On November 1, 1962, Lupowitz established in its general ledger an account designated "Interest Receivable - Penn Wynn, Inc.," and Penn Wynn established in its general ledger an account designated "Interest Payable - Joseph Lupowitz Sons, Inc." On the same date, interest at 5 percent, payable from Penn Wynn to Lupowitz, was accrued in these accounts for the years ended July 31, 1960, 1961, and 1962 in the respective amounts of $20,087.50, $22,615.00, and $24,455.00. On December 28, 1962, Penn Wynn paid in full to Lupowitz the accrued *32 interest for the years ended July 31, 1960 and 1961. On January 29, 1963, Penn Wynn paid in full to Lupowitz the accrued interest for the year ended July 31, 1962. On July 31, 1963, in the case of Lupowitz, and on August 1, 1964, in the case of Penn Wynn, interest at 5 percent payable from Penn Wynn to Lupowitz for the year ended July 31, 1963 was accrued on the books of each corporation in the amount of $24,940.00. This interest was paid in full by Penn Wynn on September 6, 1963. Interest was accrued and paid by Penn Wynn to Lupowitz, as related above, upon the advice and instruction of the independent accountant for these corporations on the ground that the Internal Revenue Service, after examining the tax returns of Lupowitz, intended to treat the transfer of funds from Lupowitz to Penn Wynn as a loan bearing 5-percent interest and to include such interest in the gross income of Lupowitz. For the year ended July 31, 1964, $27,024.99 of interest was accrued between Penn Wynn and Lupowitz on the books of the two corporations, but no payment of such accrued interest was made, on the advice of the new independent accountant, retained by the Lupowitz businesses in 1964. For the *33 taxable years ended July 31, 1965 and 1966, Lupowitz accrued on its books interest receivable from Penn Wynn in the respective amounts of $28,651.74 and $29,360.48, and Penn Wynn accrued on its books the corresponding amount of interest payable to Lupowitz. Penn Wynn made a partial payment of such accrued interest in the amount of $10,000 in each of the two years. The accountant advised that these $10,000 payments should be made in order to transfer from Penn Wynn to Lupowitz the approximate amount of cash Lupowitz would need to defray the additional Federal and state income tax liability caused by its accrual of interest income from Penn Wynn. The following table shows the taxable income (loss) reported by Lupowitz and Penn Wynn for the taxable years indicated: Fiscal year
Lupowitz
Penn Wynn **
1960
* $10,670.80
($ 1,340.83)
1961
* 16,810.01
* ( 65,156.19)
1962
* 7,351.77
* ( 188,098.80)
1963
41,940.42
( 49,244.91)
1964
32,650.54
15,708.23
1965
23,536.79
12,737.95
1966
18,734.80
( 20,719.62)
On its returns for the taxable *34 years ended July 31, 1965 and 1966, Lupowitz reported the following items of gross income: Taxable Year
1965
1966
Rents
$192,140.55
$191,679.42
Net gains (losses)
(2,792.24)
--
Other income
29,763.78
35,065.94 Included in the item "Other income" was the amount of accrued interest from Penn Wynn in each year. Lupowitz did not pay or declare any dividends during its taxable years 1965 and 1966. The respondent determined deficiencies in the income tax of Lupowitz for its taxable years ending July 31, 1965 and July 31, 1966. In the statutory notice of deficiency, respondent stated: Since for taxable years ended July 31, 1965 and July 31, 1966, your "other personal holding company income" (which includes reported interest income from Penn Wynn, Inc.) represents more than 10% of your ordinary gross income, and no dividends were paid, your total income is accordingly considered personal holding company income, and therefore you qualify * * * as a personal holding company under sections 541- 545, Internal Revenue Code. Your undistributed personal holding company income * * * is subject to the personal holding company tax. *35 ULTIMATE FINDING OF FACT During the taxable years in issue, the outstanding balance of the advances from Lupowitz to Penn Wynn was a debt of Penn Wynn owing to Lupowitz, upon which interest at 5 percent was due and payable. OPINION Prior to the 1964 amendment of the personal holding company provisions, rents did not constitute personal holding company income if they comprised 50 percent or more of the taxpayer's gross income. For its taxable years ended July 31, 1960 through July 31, 1964, the rents earned by petitioner Lupowitz satisfied the 50-percent test in each year and thus afforded Lupowitz a safe haven from the personal holding company tax. Effective for taxable years beginning after December 31, 1963, however, Public Law 88-272 (the Revenue Act of 1964, 78 Stat. 19) amended section 543 to add an additional requirement for the exclusion of rents from personal holding company income. [4]
*36 If Lupowitz' tax returns for its taxable years ended July 31, 1965 and July 31, 1966 are taken at face, petitioner satisfied the new criteria for personal holding company status in those years and is liable for the additional tax on its undistributed personal holding company income. In laboring to regain refuge from the personal holding company tax, petitioner Lupowitz now takes the position that it erred in reporting interest income from Penn Wynn, a related corporation. Lupowitz asserts that its advances were contributions to the capital of Penn Wynn rather than loans upon which interest could accrue. If, as Lupowitz contends, such accrued interest is not includible in its gross income for fiscal years 1965 and 1966, then its rental income in those years does not meet the definition of personal holding company income contained in section 543(a) (2). [5]
*37 It cannot be gainsaid that, in seeking to determine whether a given relationship involves capital or debt or whether a given payment constitutes interest or a dividend, we enter a "jungle" in which the decisional law "continues to defy symmetry." [6] See Commissioner v. Union Mutual Insurance Company of Providence, 386 F. 2d 974, 978 (C.A. 1, 1967); Tyler v. Tomlinson, 414 F. 2d 844, 847 (C.A. 5, 1969). See also Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369, et seq. (1971). One can only seek to apply what has been described as a standard "of uniquity," [7] namely, all the facts and circumstances must be examined to determine the nature of the relationship created, recognizing that, as is the case herein, the position of the taxpayer and the Government may often be reversed, depending upon the tax impact involved. Compare, e.g., Zilkha & Sons, Inc., 52 T.C. 607 (1969), and Ragland Investment Co., 52 T.C. 867 (1969), affirmed per curiam 435 F. 2d 118 *38 (C.A. 6, 1970) (respondent contended "loans" and the taxpayer contended "capital"), with Malone & Hyde, Inc., 49 T.C. 575 (1968) (respondent contended "capital" and taxpayer contended "loan"). Nor is the characterization of the transaction as it was initially created determinative of the characterization in subsequent years; what was originally debt may become capital, and vice versa. Compare Toledo Blade Co., 11 T.C. 1079, 1085 (1948), affirmed per curiam on another issue 180 F. 2d 357 (C.A. 6, 1950), with Cuyuna Realty Company v. United States, 382 F. 2d 298, 301 (Ct. Cl. 1967), and Tampa & Gulf Coast Railroad Co., 56 T.C. 1393, 1402 (1971). See and compare Fin Hay Realty Co. v. United States, 398 F. 2d 694, 698-699 (C.A. 3, 1968).
*39 We now turn to the factual situation involved herein. There is no need to review the underlying facts in detail; they are fully set forth in our findings. Both Lupowitz and Penn Wynn consistently treated the transfers as amounts due and payable on their books and records, financial statements, and tax returns. To be sure, such treatment is not determinative. Cf. C.M. Gooch Lumber Sales Co., 49 T.C. 649, 657 (1968); Malone & Hyde, Inc., supra.Nor is the absence of any formal instrument evidencing the indebtedness controlling. See American Processing & Sales Co. v. United States, 371 F. 2d 842, 857 (Ct. Cl. 1967); Malone & Hyde, supra.The same can be said of the absence of any agreement originally to pay interest. See Byerlite Corporation v. Williams, 286 F. 2d 285, 290-291 (C.A. 6, 1960); cf. Charles E. Curry, 43 T.C. 667, 692 (1965). We find it unnecessary to determine the proper characterization of the transfers at the time of their inception. By the taxable years involved herein, additional elements *40 in the situation had surfaced. Penn Wynn had made substantial repayments of the amounts transferred, commencing as early as its fiscal year 1961. See C.M. Gooch Lumber Sales Co., supra at 657. Beyond this, interest for fiscal 1960 and each subsequent year had been accrued in full by both corporations. Concededly the stimulus for the acts of accrual was the audits by the Internal Revenue Service. We recognize that the mere fact of Lupowitz' consent to the asserted deficiencies does not preclude the contention that such accruals were erroneous. But the parties went further. The interest was paid in whole or in part for each subsequent year, except 1964, and the income resulting from the accruals for all years was regularly reported by Lupowitz and the tax paid thereon. It is not without significance that such action produced a net additional income tax to Lupowitz without any countervailing current benefit from the deduction on the part of Penn Wynn, since the latter was otherwise incurring substantial losses. It may well be that there were other unarticulated motives for these actions -- for example, concern that the respondent might seek to tax the transfers by Lupowitz *41 as constructive dividends to its shareholders and a desire to bolster their defense against such a claim. To argue that, under the circumstances of this case, the actions of Lupowitz and Penn Wynn should be deemed involuntary and therefore disregarded is sheer sophistry. The acts of the parties count for more than what they say. See Wilbur Security Company v. Commissioner, 279 F. 2d 657, 662 (C.A. 9, 1960). That Lupowitz may have made a mistake of judgment as to the tax consequences involved is beside the point. Cf. Bailey v. United States, 360 F. 2d 113 (C.A. 9, 1966); Estate of George Stamos, 55 T.C. 468, 474 (1970). [8] What is involved herein is nothing more than a belated attempt on the part of petitioner Lupowitz, based on hindsight, to extricate itself from the personal holding company trap into which it inadvertently fell during the two years in issue. [9]
*42 In view of the foregoing and based upon the entire record herein, we conclude that, at least by the taxable years in question, a debtor-creditor relationship existed between Penn Wynn and Lupowitz[10] in respect of which there was an implied agreement that interest was due and payable. Accordingly, the accruals by Lupowitz were proper and the amount thereof was includible as interest [11] in its gross income. It follows that Lupowitz is subject to the personal holding company tax as determined by respondent. [12]
*43 Issue 2. Constructive Dividend FINDINGS OF FACT To the extent applicable, the findings of fact as to issue 1 are incorporated herein by reference. Mansfield Homes, Inc. (hereinafter Mansfield Homes) was incorporated in 1948 and was primarily engaged in building houses. It kept its books and filed its tax returns on the accrual method of accounting and on the basis of a taxable year ending October 31. Prior to and during the years in issue, Harold B. Lupowitz and Esther Lupowitz (subsequently known as Esther Meisler) each owned one-half of the outstanding stock of Mansfield Homes. On April 3, 1964, Mansfield Homes sold its remaining physical asset, consisting of an interest in certain land located in West Goshen, Pennsylvania, and received sales proceeds of $89,226.04. Its basis in the land was $55,646.96 and in its tax return for the year ended October 31, 1964 it reported the resulting gain of $33,579.08. Except for this sale, Mansfield Homes was not actively engaged in any business during the years involved herein. The balance sheets included in the tax returns of Mansfield Homes for the taxable years subsequent to the year ending October 31, 1963 showed that it had *44 assets, consisting solely of cash, notes and accounts receivable, a corporate bond, and incorporation costs; and liabilities, consisting solely of accounts and loans payable, other current liabilities, and mortgage notes and bonds payable in one year or more. Commencing at least as early as 1958, Lupowitz made cash transfers to Mansfield Homes, and, commencing at least as early as 1959, Mansfield Homes made transfers to Lupowitz in the following amounts: Fiscal year of
From Lupowitz
From Mansfield
Mansfield
to Mansfield
Homes to
Homes
Homes
Lupowitz
1958
$35,000
None
1959
61,000
$25,000
1960
5,600
71,000
1961
36,500
None
1962
None
10,000
1963
1,000
21,100
1964
28,500
58,000
1965
* 6,000
* 30,000
1966
None
None
The transfers between Lupowitz and Mansfield Homes were entered in the Lupowitz ledger account designated "Exchange." As was the case with other transfers of funds between companies owned by the Lupowitz family, there was no express agreement or understanding between the management of Mansfield Homes and Lupowitz as to any repayment or with respect to interest *45 on the transferred funds. The tax returns of Mansfield Homes for its taxable years 1965 and 1966 showed earned surplus and undivided profits of $27,802.06 as of October 31, 1964 and $27,161.65 as of October 31, 1965. Mansfield Homes did not pay or declare any dividends in its taxable years 1964 or 1965. In the statutory notices of deficiency sent to the petitioners Harold B. Lupowitz, Docket No. 2756-70, and Esther Meisler, Docket No. 2757-70, the respondent determined that Harold and Esther each received a constructive dividend in fiscal 1965 of $8,000 as a result of the transfer of funds between Mansfield Homes and Lupowitz during that year. Respondent derived the amount of the alleged constructive dividend from the fact that the net transfer of funds from Mansfield Homes to Lupowitz in fiscal 1965 amounted to $24,000 and the fact that Harold and Esther each owned approximately one-third of the stock of Lupowitz. ULTIMATE FINDING OF FACT During 1965, the net advances by Mansfield Homes to Lupowitz constituted a bona fide obligation of Lupowitz to Mansfield Homes representing an "investment" in the former corporation by or for the benefit of the latter corporation. OPINION
*46 This issue requires a determination whether the net transfers of funds from Mansfield Homes to Lupowitz in calendar year 1965 resulted in constructive dividends to the common shareholders of the two corporations -- i.e., petitioners Harold B. Lupowitz and Esther Meisler (hereinafter referred to as "petitioners"), who each owned one-half of the stock of Mansfield Homes and about one-third of the stock of Lupowitz. [13] Such a determination depends in the first instance upon a consideration of the nature of the relationship between Lupowitz and Mansfield Homes in respect of the transfers. Much of what we have said in connection with the first issue herein is equally applicable to the instant issue and we see no purpose in repeating ourselves. We would simply add to our previous observations the additional principle that a transfer of funds between two corporations will *47 not necessarily result in a constructive dividend to shareholders simply because there is common ownership of the transferor and transferee corporations. W. B. Rushing, 52 T.C. 888, 894 (1969), affirmed as to other issues 441 F. 2d 593 (C.A. 5, 1971). In stating this principle, we recognize, of course, that transfers between related corporations may result in constructive dividends when the transferred funds are siphoned off for the personal benefit of the shareholders either directly or by way of discharging their legal obligations. Sammons v. Commissioner, F. 2d (C.A. 5, 1972), affirming per curiam a Memorandum Opinion of this Court; Glenn E. Edgar, 56 T.C. 717, 758 (1971); cf. PPG Industries, Inc., 55 T.C. 928, 1003 (1970); George R. Tollefson, 52 T.C. 671, 681 (1969), affirmed 431 F. 2d 511 (C.A. 2, 1970). In the instant situation, there is not the slightest suggestion that Mansfield Homes was not a viable taxable entity. The transfers in question were part of a pattern of exchange of funds between Mansfield Homes and Lupowitz (and indeed among the Lupowitz enterprises generally) extending as *48 far back as 1958. The fact that such transfers were made without interest is not determinative. [14] See p. 22, supra. Both Lupowitz and Mansfield Homes treated the transfers as creating an obligation at the corporate level, i.e., the amounts involved were to be repaid to the corporate entity from which the funds were derived. We find it unnecessary, for the purposes of this case, to characterize that obligation as an "indebtedness" in the technical sense or as some other form of "investment" in Lupowitz by Mansfield Homes or for its benefit. See W. B. Rushing, supra at 893. The cardinal fact is that the obligation existed and it is the retention of such an obligation at the corporate level which distinguishes cases involving excessive payments for services or property by one related corporation to another, where it can be said that the shareholders of the receipient corporation received a tangible benefit. Sammons v. United States, 433 F. 2d 728 (C.A. 5, 1970); Sparks Nugget, Inc. v. Commissioner, 458 F. 2d 631 (C.A. 9, 1972), affirming a Memorandum Opinion of this Court; Worcester v. Commissioner, 370 F. 2d 713 (C.A. 1, 1966), *49 affirming on this issue a Memorandum Opinion of this Court; Equitable Publishing Co. v. Commissioner, 356 F. 2d 514 (C.A. 3, 1966), affirming per curiam a Memorandum Opinion of this Court. [15] Compare John D. Gray, 56 T.C. 1032 (1971). That fact also serves to distinguish the previously cited cases where the funds transferred were siphoned off to or for the benefit of a shareholder. [16] See page 30, supra. Insofar as the petitioners herein are concerned, the only discernible benefit is that Lupowitz was able to obtain the use of funds of Mansfield Homes on an interest-free basis. We consider this element, in and of itself, an insufficient foundation for holding that the net transfers of funds constituted a constructive dividend. Compare J. Simpson Dean, 35 T.C. 1083, 1087-1090 (1961). Similarly, we do not consider it determinative that Mansfield Homes did not have a specific business purpose in making the transfers to Lupowitz, although the absence of such purpose, as well as the absence of any requirement of interest, is a fact which we took into account in reaching our conclusion as to the existence of a bona fide obligation. See Sammons v. United States, supra at 730-732; *50 W. B. Rushing, supra at 894. Under the facts and circumstances of this case as revealed by the entire record, we are satisfied that the net advances constituted a bona fide obligation of Lupowitz to Mansfield Homes and should therefore not be treated as a constructive dividend to petitioners. In order to reflect our conclusions on the two issues and the concessions of the parties on other issues involved herein, Decision will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: Albert Kauffman and Martha Kauffman, Docket No. 2755-70; Harold B. Lupowitz and Sophie Lupowitz, Docket No. 2756-70; Esther Meisler, Docket No. 2757-70; Leo C. Meisler and Esther Meisler, Docket No. 2758-70.↩
2. All issues in Albert Kauffman and Martha Kauffman, Docket No. 2755-70, and Leo C. Meisler and Esther Meisler, Docket No. 2758-70, have been conceded or settled and are therefore not further dealt with in this opinion. ↩
3. All statutory references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended.↩
**. Before net operating loss deduction.↩
*. Before Internal Revenue adjustments previously indicated. ↩
4. Public Law 88-272 amended the pertinent provision to read as follows: SEC. 543. PERSONAL HOLDING COMPANY INCOME. (a) General Rule. --For purposes of this subtitle, the term "personal holding company income means the portion of the adjusted ordinary gross income which consists of: * * * * * * (2) Rents. --The adjusted income from rents; except that such adjusted income shall not be included if-- (A) such adjusted income constitutes 50 percent or more of the adjusted ordinary gross income, and (B) the sum of-- (i) the dividends paid during the taxable year (determined under section 562), (ii) the dividends considered as paid on the last day of the taxable year under section 563(c) (as limited by the second sentence of section 563(b)), and (iii) the consent dividends for the taxable year (determined under section 565), equals or exceeds the amount, if any, by which the personal holding company income for the taxable year (computed without regard to this paragraph and paragraph (6) and computed by including as personal holding company income copyright royalties and the adjusted income from mineral, oil, and gas royalties) exceeds 10 percent of the ordinary gross income.↩
5. Even assuming the $10,000 payments Lupowitz received from Penn Wynn in those years to be personal holding company income (dividends paid on a contribution to capital, perhaps), such amounts alone are insufficient to make Lupowitz' rental income become personal holding company income under section 543(a) (2)↩ because they would not exceed 10 percent of Lupowitz' "ordinary gross income."
6. It remains to be seen whether this situation will be cured or ameliorated when respondent issues regulations under section 385, added by the Tax Reform Act of 1969 (Pub. L. 91-172, 83 Stat. 487, 613, Sec. 415(a)).↩
7. Goldberg, J., put it this way in Tyler v. Tomlinson, 414 F. 2d 844, 847↩ (C.A. 5, 1969): While some legal problems are endowed with a case-by-case uniqueness calling for ad hoc determinations, the debt-equity problem has exhibited a special kind of uniquity. The oftcited principle that each case "must be judged on its own unique fact situation" [citations omitted] has resulted in a lack of decisional uniformity even in cases where the individual creditor-debtor relationships exhibit ostensible similitude.
8. Compare Commissioner v. Duberstein, 363 U.S. 278, 286↩ (1960): "It scarecely needs adding that the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter." 9. Cf. Parsch Realty Co., T.C. Memo. 1954-142↩.
10. Perhaps the funds represented by transfers among the various Lupowitz enterprises might properly be viewed as risk capital of such enterprises as a whole but this does not preclude a determination that they should be considered debt as between Lupowitz and Penn Wynn. Cf. Albert Ravano, T.C. Memo. 1967-170↩. 11. Respondent makes no argument that interest at 5 percent should be imputed in any event under section 482. Cf. B. Forman Company v. Commissioner, 453 F. 2d 1144 (C.A. 2, 1972), reversing 54 T.C. 912 (1970); Kahler Corp., 58 T.C. 496↩ (1972). We, therefore, need not consider this question or the further question whether such imputed interest should be considered personal holding company income. A similar problem exists in respect of section 483. See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (3d Ed. 1971), page 8-40. 12. The extent to which petitioner Lupowitz may avail itself of the deficiency dividend procedure under section 547 is not before us.↩
*. All these transfers occurred in calendar year 1965.↩
13. Respondent has used the one-third figure in computing the amount of the constructive dividend. The petitioners each owned somewhat less than one-third of Lupowitz' total shares outstanding (classes A and B), however.↩
14. Respondent conceivably might have pursued an alternative course and sought to impute interest on such transfers. Cf. Kerry Investment Co., 58 T.C. 479↩ (1972). See also footnote 11, supra. 15. The case of David A. Aylsworth, T.C. Memo. 1963-221↩, relied on by respondent, also falls in this category.
16. The record clearly reveals that Lupowitz was sufficiently prosperous financially so as to preclude any argument that the "investment" by Mansfield was not supported by full value. Cf. John D. Gray, 56 T.C. 1032↩ (1971).