ROSS GLOVE COMPANY, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7486-70, 3837-71, 3838-71, 3848-71, 3849-71. Filed July 23, 1973.

*Walter Treumann, Edward C. Rustigan, Stanton A. Kessler,* and *Franklin P. Auwarter,* for the petitioners.

*Denis J. Conlon* and *James L. Norris,* for the respondent.

SIMPSON, *Judge:* The respondent determined the following deficiencies in, and additions to, the petitioners' income tax:

| Petitioner | Year | Deficiency | Sec. 6653(b) [2] addition | Sec. 6654(a) addition |
|---|---|---|---|---|
| Ross Glove Co. | 1961 | $19,075.42 | | |
| | 1962 | 55,424.72 | | |
| | 1963 | 73,307.41 | | |
| | 1964 | 66,528.43 | | |
| | 1966 | 60,259.52 | $30,129.76 | |
| | 1968 | 65,389.64 | | |
| | 1969 | 17,247.13 | | |
| Carl and Janet Ross | 1961 | 85,234.69 | 42,617.34 | $49.06 |
| | 1962 | 170,506.43 | 85,253.21 | 34.24 |
| | 1963 | 146,772.19 | 73,386.09 | 28.10 |
| | 1965 | 45,046.76 | 22,523.38 | |
| | 1966 | 125,740.11 | 62,870.06 | |
| | 1968 | 130,982.05 | 65,491.03 | |
| | 1969 | 38,109.62 | 19,054.81 | |

---

[1] Cases of the following petitioners are consolidated herewith: Ross Glove Company, docket Nos. 3837-71 and 3838-71; and Carl Ross and Janet R. Ross, docket Nos. 3848-71 and 3849-71.

[2] All statutory references are to the Internal Revenue Code of 1954.

The respondent also determined that if the section 6653(b) addition for 1963 with respect to the individual petitioners is not applicable, that a section 6651(a) addition is applicable for that year. In his amended answer, the respondent increased the deficiencies against the Ross Glove Co. by $43,864.16 for 1961 and by $51,596.99 for 1962. Some of the issues have been settled, and the issues remaining for decision are: (1) Whether the income from the Philippine manufacturing operation is attributable to Mr. Ross or to Carla Trading, a Bahamian corporation; (2) whether advances from Carla Trading to Ross Glove resulted in taxable dividends to Mr. Ross, who controlled both corporations; (3) whether certain transactions between Ross Glove and the Philippine manufacturing operation were at arm's length within the meaning of section 482; (4) whether the travel expenses of the manager of the Philippine operation and his family are deductible in their entirety by Ross Glove; and (5) whether the fraud penalty is applicable with respect to Mr. Ross for the years 1961 through 1969.

FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The individual petitioners, Carl Ross and Janet R. Ross, are husband and wife, who maintained their legal residence in Sheboygan, Wis., at the time their petitions were filed in this case. They filed their joint Federal income tax returns for the years 1961 through 1969 with the district director of internal revenue, Milwaukee, Wis.

The corporate petitioner, Ross Glove Co. (Ross Glove), was incorporated in 1917 under the laws of the State of Wisconsin and had its business office in Sheboygan, Wis., at the time its petitions were filed in this case. It filed its Federal income tax returns for the years 1961 through 1969 with the district director of internal revenue, Milwaukee, Wis.

### Description of the Petitioners and the Glove Industry

Since it was founded by the father of Mr. Ross, Ross Glove has manufactured men's, ladies', and boys' leather dress gloves in Sheboygan, Wis., and has sold such gloves to wholesalers and retailers in the United States. In addition, since 1959, Ross Glove has imported gloves from the Philippines and sold such gloves to wholesalers and retailers in the United States.

Mr. Ross joined Ross Glove on a full-time basis in 1946, and during the period from 1946 until his father's death in 1957, he assisted his father in operating the business. After his father's death, Mr. Ross became the sole shareholder of Ross Glove and its chief executive officer. In 1972, he was president of Ross Glove and owned approximately 60 percent of the outstanding shares of Ross Glove. His chil-

dren, Carla (who was born in 1957) and Hugh Andrew (who was born in 1964), each owned approximately 20 percent of such shares.

The glove industry has always been very competitive, and during the period from 1946 to 1959, it included many small, cost-conscious manufacturers. During such period, Ross Glove manufactured between 40,000 to 60,000 dozen pairs of gloves per year in its Sheboygan, Wis., plant. Such plant consisted of 30,000 square feet and employed between 175 and 200 employees.

The primary raw materials utilized by Ross Glove in the manufacture of gloves were pickled sheepskins (which are made into leather), rabbit linings (which are used to line fur-lined gloves), and knit linings (which are used to line knit-lined gloves). The knit linings were domestically produced, while the sheepskins and fur linings were purchased by Ross Glove from suppliers in the Gloversville, N.Y., area, which obtained such materials from outside the United States. After they were purchased, the sheepskins were tanned in the Gloversville area, and the resultant leather was shipped to Sheboygan, where the gloves were manufactured.

### Interest in a Foreign Glove-Manufacturing Operation

Serious competition to the domestic glove industry began in 1955 with the importation of gloves from the Philippines, Japan, Europe, and Puerto Rico. One of Ross Glove's most important domestic competitors was opening a plant in the Philippines and several other competitors were operating in Puerto Rico. Labor rates were cheaper in those countries than in the United States, and as a result, Ross Glove was forced to lower its prices in order to maintain its portion of the market.

Mr. Ross began to consider establishing a foreign glove-manufacturing facility, and in 1957, he went to Puerto Rico to inspect glove-manufacturing operations located there. Sometime after such trip, Mr. Ross met with Mr. Louis Feurer, in the Milwaukee, Wis., office of Peat, Marwick, Mitchell & Co. (PM-Milwaukee), and discussed the possibility of establishing a foreign manufacturing facility. PM-Milwaukee were the accountants for Ross Glove and prepared its Federal income tax returns. Mr. Feurer had gained familiarity with the glove industry and with Ross Glove as audit manager of the Ross Glove account for PM-Milwaukee since 1950, and through other work involving the leather industry. Mr. Ross also spoke with key Ross Glove customers and was advised to consider overseas production or risk the possibility of losing their business.

In the spring of 1958, Mr. Ross met Mr. L. J. Gould, vice president of South Seas Trading Corp., a New York corporation (South Seas (NY)), to discuss the purchase of gloves by Ross Glove. A 100-

percent subsidiary of South Seas (NY), South Seas Trading Corp., a Philippine corporation (South Seas (Phil.)), supplied the labor for the manufacture of various goods on a contract basis under the following arrangement: South Seas (NY) signed a contract with the customer, the customer sent the materials and generally the machinery needed to complete his order to the Philippines, and the labor services were performed by South Seas (Phil.), which charged South Seas (NY) for such services. South Seas (NY) then charged the customer a contract price for the services, which included the expenses of both South Seas (NY) and South Seas (Phil.) and a profit for each. Pursuant to such an arrangement, South Seas (NY) charged Ross Glove $4.50 a dozen for a trial lot of 94 dozen pairs of leather gloves, and such charge was reduced to $4.30 a dozen on subsequent lots, which totaled about 3,000 dozen. Such prices included the costs of shipping the raw materials to the Philippines and the gloves from the Philippines to the west coast of the United States.

In late 1958, Ross Glove sent 10 sewing machines to the Philippines, and thereafter, it sent leather and rabbit linings to the Philippines at the approximate rate of 100 dozen per week. During 1959, South Seas (Phil.) performed the manufacturing operations through the preliminary inspection and packed the gloves 12 pairs to a bundle and 12 to 16 bundles to a carton. Ross Glove pressed and boxed the gloves and conducted the final inspection. The arrangement between Ross Glove and South Seas (NY) ended in early 1960.

During 1959, Mr. Ross made several business trips overseas. In March, he flew to the Philippines via Turkey, where he investigated sources of supply for sheepskins. While in the Philippines, he inspected the South Seas (Phil.) operation, as it was incurring difficulties in producing the gloves which were being manufactured for Ross Glove. He also investigated the possibility of setting up his own glove-manufacturing operation in the Philippines. Upon his return to the United States, Mr. Ross had a discussion concerning the advantages of doing business in the Philippines with Mr. James H. Casey, Jr., chief executive officer of the National Association of Glove Manufacturers, Inc. Among the advantages discussed was the preferential treatment offered to Philippine-produced articles imported into the United States under the Laurel-Langley Agreement (22 U.S.C. sec. 1372). Under such agreement, Philippine-produced articles were entitled to U.S. Customs duty reductions as follows: 1959–1961, 90 percent; 1962–1964, 80 percent; 1965–1967, 60 percent; 1968–1970, 40 percent; 1971–1973, 20 percent; and after 1973, 0 percent. 22 U.S.C.A. sec. 1372 note. In 1959, the U.S. rate of duty per dozen pairs of men's lined gloves was $6.50, and the Laurel-Langley Agreement reduced such duty to 65 cents per dozen pairs.

After learning of the Laurel-Langley Agreement, Mr. Ross decided seriously to consider establishing a manufacturing operation in the Philippines. He believed that the success of such an operation would depend on the hiring of a competent American manager such as Mr. Vernon TeWinkel, the manager of the Oxford, Wis., plant of Ross Glove. Mr. TeWinkel was interested in the assignment but wanted to investigate the living conditions in the Philippines before committing himself, and arrangements were made for Mr. TeWinkel and Mr. Ross to go to the Philippines in early July 1959. Before leaving for the Philippines, Mr. Ross advised PM-Milwaukee that he was interested in organizing a foreign corporation which would be engaged in foreign purchasing and manufacturing activities. Mr. Ross also asked PM-Milwaukee to recommend an accounting firm in the Philippines, and the firm of Sycip, Gorres, Velayo & Co. (Sycip), the largest in the Far East, was recommended.

Mr. Ross and Mr. TeWinkel flew to the Philippines in early July 1959. They discussed a variety of manufacturing and personnel problems, and the possible rental of a factory, with a consultant on labor matters. Mr. TeWinkel acquainted himself with living and school conditions, while Mr. Ross met with Mr. Del Rosario of the Security Bank & Trust Co. of Manila (Security Bank) and was given information about exchange rates. There were two basic rates: the official rate set by the Central Bank of the Philippines (Central Bank), a government agency, of 2 pesos to $1 and the free rate of approximately 3.7 pesos to $1. Mr. Del Rosario stated that he could obtain free-rate pesos for Mr. Ross if such pesos were needed. Mr. Ross also visited Sycip and met with an auditor and a tax attorney who explained various accounting and fiscal problems which might be encountered in establishing a Philippine operation. Both Sycip and Security Bank advised Mr. Ross that the Manila law firm of Ross, Selph & Carrascoso was the leading law firm in the Philippines, and he visited such firm. Mr. Selph, one of the two senior partners, explained the needs for various permits and licenses, and since no foreign corporation had yet been formed, Mr. Selph suggested that Mr. Ross sign the application for the permit to do business in the Philippines as an individual.

Mr. Ross and Mr. TeWinkel returned to the United States, and on July 15, 1959, Mr. Feurer of PM-Milwaukee wrote to Mr. Ross stating that the tax benefit to be gained by forming a foreign corporation would be the temporary accumulation of working capital free from U.S. taxation, but that Mr. Ross would be taxed on such moneys when they were transferred to the United States. PM-Milwaukee also advised Mr. Ross not to establish a foreign corporation because they believed that the U.S. tax benefit was minimal, and feared that Mr. Ross would make the business decisions from within the United States,

resulting in the foreign corporation not being recognized for Federal income tax purposes. However, as it was Mr. Ross' intention not to return funds earned abroad to the United States currently, but to accumulate them for foreign expansion and the carrying of a large raw material inventory, he continued to consider the possibilities of forming a foreign corporation. On July 23, 1959, Mr. J. C. Stoffel, the partner in charge of the tax department of PM-Milwaukee, also wrote to Mr. Ross. He enclosed an article concerning "tax havens" that described favorable tax jurisdictions, including the Bahamas. Mr. Ross was interested in the Bahamas because of the stability of its government, its proximity to the United States, and the fact that Peat, Marwick, Mitchell & Co. had an office there.

Within 2 weeks after returning to the United States, Mr. TeWinkel advised Mr. Ross that he would accept the assignment as manager of the Philippine operation, and on July 29, 1959, Mr. Ross wrote to Mr. Selph enclosing an application in his individual name to do business in the Philippines. By the end of July, Mr. Ross had decided that the Philippine operation would be part of a foreign corporation, but he was not ready to organize the corporation.

### Establishment of the Philippine Business

During the latter part of September 1959, Mr. Ross made another trip to the Philippines, and he had further discussions concerning the establishment of a factory. Renting a factory building with air conditioning proved not to be feasible, and Mr. Ross decided to purchase land and erect a building. A site was selected, arrangements for its purchase were effectuated, and plans were drawn for the factory building. A timetable was also worked out for the factory construction, for the arrival of Mr. TeWinkel, a Ross Glove sewing instructor, and maintenance mechanic, and for the shipment of equipment and raw materials from Ross Glove. Mr. Ross then discussed with Mr. Del Rosario the establishment of a building account with the Security Bank to be utilized for the purchase of land and payment of expenditures related to the construction of the factory. Such an account was established under the name of Carl Ross. Mr. Del Rosario advised Mr. Ross that he would issue instructions to Mr. Ross as to where and to whose accounts outside of the Philippines Mr. Ross should deposit U.S. dollars, and that he would credit the building account with pesos at the free rate. By the end of 1959, $25,000 of his personal funds had been deposited in this manner by Mr. Ross, and 89,000 pesos had been credited to the building account. The entire 89,000 pesos was used to pay for land and construction of the factory. Mr. Del Rosario and Mr. Ross also discussed the establishment of two other accounts to be opened later. There would be a company account (No. 1 account)

which would be supervised by the Central Bank and to which pesos would be deposited at the official rate of exchange. Such account would be utilized for normal manufacturing expenditures, including salaries and wages. The second account (No. 2 account) would be under Mr. Ross' personal name and pesos would be deposited to it at the free rate of exchange in the same manner as the building account. This account would be used for expenditures such as employee fringe benefits and bonuses, repairs, part of the manager's salary, and maintenance. The building account was not utilized because the pesos in the No. 2 account were to be remitted by a foreign corporation rather than Mr. Ross. The two-account system was normal practice in the Philippines.

While in the Philippines, Mr. Ross also had a discussion with two members of the Sycip accounting firm. He told them that he was establishing a Philippine operation, which would be part of a foreign corporation, and asked how such operation should be organized, considering that due to the glove-manufacturing business cycle, the operation would have to start production by January. He was told that the organization of a Philippine corporation would require his continued presence in the Philippines, and he was advised to file documents in the Philippines as a sole proprietor during the following year. Mr. Ross was also advised that the Central Bank maintained control over contracting firms by requiring that sufficient dollar remittances had to be made to the contracting firm to cover the value added to the materials in the Philippines. He was told that a unit rate per dozen pairs of gloves for such added value would have to be negotiated with the Central Bank, and that, in light of the prohibition on profit remittances from the Philippines, manufacturers normally negotiated a low rate so that their Philippine operations would show at most nominal profits and pay little if any Philippine income tax. Sycip agreed to establish the books for the Philippine business, prepare its audit reports, and prepare and file its Philippine income tax returns. Sycip prepared and filed such returns under Mr. Ross' name for the years 1960–69, and Mr. Ross paid no Philippine income taxes during such period.

Before returning to the United States, Mr. Ross met with Mr. Selph, his attorney, and told him of his intent to form a foreign corporation, his decision to buy land and build a factory, and the advice received from Sycip. He asked Mr. Selph to handle the legal aspects of the land purchase, and Mr. Selph advised Mr. Ross that under Philippine law, the land could be registered under the name of Philippine or United States individuals, but not under the name of a foreign corporation. Mr. Selph also advised Mr. Ross that an application for a business name in the Philippines would have to be filed. On December 7, 1959, Mr. TeWinkel applied for the name "Carl Ross Glove Mfg." and the

Philippine business operated under such name until June 7, 1960, when the name was changed to "Ross Glove Manufacturing." In 1968, the name was changed to "Carla Manufacturing." Mr. Ross is shown on all Philippine records and all filings in the Philippines as the owner, in his individual capacity, of the Philippine business.

### Organization of Carla Trading

Upon his return to the United States, Mr. Ross told Mr. Stoffel of PM-Milwaukee that he desired to establish a Bahamian corporation and asked him to write a letter of introduction to the Bahamian office of Peat, Marwick, Mitchell & Co. (PM-Nassau). Mr. Stoffel did so, and on November 3, 1959, Mr. D. E. Britchford of PM-Nassau wrote to Mr. Ross and requested an outline of the intended method of operation of the Bahamian corporation to be formed. On November 7, 1959, Mr. Ross sent Mr. Britchford the requested outline, which stated that the name of the corporation would be Carla Trading Corporation Ltd. (Carla Trading); that such corporation would be a contractor for U.S. firms for sewing work to be performed in foreign countries, particularly in the Philippines; that it might purchase raw materials in Europe or the Middle East and sell such to U.S. firms; and that its capitalization would be $25,000, based on the costs of land and factory construction in the Philippines. Carla Trading was incorporated in the Bahamas on December 10, 1959.

Mr. Ross met with Mr. Britchford in Nassau on December 18, 1959. Mr. Ross stated that he would be president of Carla Trading, and it was agreed that a member of PM-Nassau would be secretary, that the directors would be Mr. Ross and his mother, and that Mr. Ross would own 51 percent of the stock and his daughter, Carla Ross, 49 percent. On January 27, 1960, the board of directors and officers were elected at a shareholders meeting in accordance with the arrangements made on December 18, 1959. On February 21, 1960, the board of directors of Carla Trading authorized the issuance to Mr. Ross of 4,474 shares of common stock, to Carla Ross, 4,298 shares, and 1 qualifying share to each of five Bahamian residents. The total par value of the shares issued was $25,000, and the corporate records show that such shares were issued in consideration for the transfer to the corporation of the land and factory in the Philippines.

In 1962, Miss Ruth Woepse, secretary of Ross Glove, replaced Mr. Ross' mother as a director. In 1964, the stock structure of Carla Trading was changed, with the addition of class of nonvoting common stock. After such change, Carla and Mr. Ross' newly born son, Hugh Andrew, each owned (except for qualifying shares) 50 percent of the nonvoting common stock, and Mr. Ross (except for qualifying shares) owned all of the voting stock.

During the December 1959 meeting, Mr. Britchford also advised against Carla Trading having a bank account in the Bahamas because of high Bahamian bank transfer taxes; he agreed to the utilization of an account in the Bank of Montreal in Windsor, Canada, which was in Mr. Ross' name, as the Carla Trading account, provided that the account name be changed to Carla Trading. The name was changed, but Mr. Ross remained the only person authorized to write checks on the account, and he kept the blank checks in Sheboygan, except when he traveled to the Philippines.

During the same meeting, Mr. Ross also told Mr. Britchford of the advice he had received from Mr. Selph and that although the Philippine operation was registered in the Philippines in his own name, he intended that it be owned by Carla Trading. During or after the meeting, Mr. Britchford typed an outline of Carla Trading procedures stating that Carla Trading would sew skins "in its Philippine plant" and that "Subject to no complication of Philippine law the title to the property in the Philippines would be in the name of the Bahamian Company." On December 22, 1959, Mr. Ross, in accordance with a request of Mr. Britchford, cabled Mr. Selph:

Would prefer changing name on our building ownership and our bank account to Carla Trading Corporation incorporated in Nassau Bahamas all other records to remain as is Advise

On January 5, 1960, Mr. Selph wrote to Mr. Ross that Carla Trading was disqualified from acquiring land in the Philippines because it was not a Philippine corporation controlled by U.S. shareholders. He also wrote that the transfer of the bank account might raise tax problems and that to avoid foreign exchange difficulties, the record ownership on the bank account should not be changed. Mr. Ross sent Mr. Selph's letter to Mr. Britchford and telephoned him a few days later. Mr. Britchford stated that he was familiar with, and had worked with, deeds of trust, and it was agreed that Mr. and Mrs. Ross would file a deed of trust which would acknowledge that Mr. Ross was holding the Philippine property for Carla Trading, the beneficial owner. On August 24, 1960, Mr. and Mrs. Ross executed a deed of trust in which they declared that they held the right, title, and interest to the Philippine property solely for the use and benefit of Carla Trading. After its execution, the deed of trust was sent to PM-Nassau to be kept with the corporate records of Carla Trading. It was never recorded in the Philippines, the Bahamas, or the United States. Several years later, a copy of the deed of trust was sent to Mr. Selph.

During the early years of Carla Trading's existence, PM-Milwaukee and PM-Nassau emphasized to Mr. Ross the danger of the corporation not being treated as a foreign corporation for purposes of the U.S. income tax, and the importance of making Carla Trading business

decisions abroad and meticulously following the invoicing procedures which had been established.

## The Production of Gloves

Mr. TeWinkel arrived in the Philippines in December 1959 and assumed his position as supervisor of all production procedures. In February 1960, the No. 1 account, under the name of Carl Ross Glove Mfg., and the No. 2 account, under the names of Mr. Ross and Mr. TeWinkel, and later under the name of Mr. Ross, were established with the Security Bank. Such accounts were utilized in the manner which Mr. Del Rosario suggested, and during the entire period from 1960 to 1969, all moneys to such accounts were provided from the Carla Trading account with the Bank of Montreal. All such moneys were spent on the Philippine business, and none was used for Mr. Ross' personal needs or purposes. The financial statements of the Philippine operation, which were prepared by Sycip for the years 1960–69, included the advances made to and expenditures made from the No. 1 account, but not those advances made to or expenditures made from the No. 2 account. However, Sycip had complete knowledge of the No. 2 account and prepared separate reconciliations of such account, which were used in preparing the yearly financial statements of Carla Trading.

During 1960, Mr. TeWinkel negotiated a value-added rate of 5.50 pesos per dozen pairs of gloves with the Central Bank. Such rate included a markup over direct costs of 20 percent, consisting of 15-percent overhead and 5-percent profit. Such markup was the minimum markup allowed by the Central Bank for glove manufacturers. During 1965, the minimum markup was increased to 30 percent.

The production of gloves in the Philippines was begun in 1960 with machines on loan from Ross Glove, including those which had been supplied to South Seas (Phil.). During 1960, the Philippine business recorded a loss of 27,000 pesos for Philippine purposes. The Central Bank questioned the loss and required that Ross Glove advance moneys to make up the loss and that it agree to cover any future losses.

During the period from 1960 through 1962, Mr. Ross arranged for the purchase of sheepskins from the Middle East and rabbit linings from Europe; and according to the books of Carla Trading, Carla Trading then resold such materials to Ross Glove at cost plus a broker's commission. The rabbit linings were shipped directly to the Philippines, but the sheepskins were shipped to the United States for tanning, and during early 1961, for cutting, before they were shipped to the Philippines. Ross Glove acquired title to the linings before they reached the Philippines and the skins before they reached the United States. The suppliers were paid for the materials through the account under

the name of Carla Trading at the Bank of Montreal with funds which Ross Glove had remitted to the account. With respect to the manufacturing services performed in the Philippines, Carla Trading invoiced Ross Glove on a periodic schedule, and Ross Glove made advances in accordance with such invoices by remitting funds to the Carla Trading account with the Bank of Montreal. Such funds were then remitted to the No. 1 and No. 2 accounts with the Security Bank. Throughout the entire manufacturing process in the Philippines during 1960–62, Ross Glove owned the raw materials.

By the end of 1961, Ross Glove had accrued an account payable on its records to Carla Trading in the amount of $120,160.20, resulting from commissions on sheepskins and rabbit linings owing to Carla Trading, amounts owing for manufacturing services rendered in the Philippines, and other amounts which had been loaned to Ross Glove. PM-Milwaukee suggested that the account be formalized by a 1-year note at 6-percent interest, and such a note was executed on January 2, 1962. Ross Glove accrued such interest, which amounted to $7,209.71, on its books for 1962, and in that year, as the result of such accrual and the accrual on the books of Ross Glove of additional commissions and amounts owed to Carla Trading for manufacturing services, the account payable was increased by $197,947.49 to a total of $318,107.69. At the end of 1962, Mr. Stemper of PM-Milwaukee advised Ross Glove to issue to Carla Trading a non-interest-bearing note of $318,107.69 covering the total of the 1961–62 accounts payable, and such note was issued on December 31, 1962. The note had a 10-year maturity.

At the end of 1962, Mr. Stemper also advised Mr. Ross regarding the effects of the Revenue Act of 1962 and suggested that Carla Trading purchase from Ross Glove all raw materials in, or in transit to, the Philippines, as well as all goods in process and finished in the Philippines, effective December 31, 1962. On that date, all such inventory was transferred on the books of both corporations from Ross Glove to Carla Trading for $165,063.10, which amount was made up of Ross Glove's cost plus a 5-percent profit. On its books, Ross Glove established an account receivable for $165,063.10, which was reduced during 1963 to $46,899.68 and was eliminated in 1965, as gloves were purchased from Carla Trading.

Beginning in 1963, some changes occurred in the production of gloves. Ross Glove directly purchased the skeepskins from the Middle East sellers, caused the skins to be tanned in the United States, and then sold the finished leather to Carla Trading for the manufacture of gloves in the Philippines. The rabbit linings were purchased by Carla Trading directly from the European sellers and shipped to the Philippines for manufacture. Thus, Carla Trading was invoiced for the rabbit linings by the suppliers, Ross Glove invoiced Carla

Trading for leather, and Carla Trading, which owned all materials in the Philippines, invoiced the finished gloves to Ross Glove f.o.b. Manila. The funds used by Carla Trading to purchase rabbit linings and manufacture the gloves consisted of advances made by Ross Glove. Such advances were borrowed by Ross Glove, including bank loans guaranteed by Carla Trading. In this connection, Carla Trading subordinated any amounts owed to it by Ross Glove to the amounts of the bank loans, and with respect to one loan, the entire stock of Carla Trading was pledged as collateral. The records of Carla Trading also indicate that after 1962, it purchased the newly acquired machinery used in the Philippines.

There were many difficulties in operating a factory in the Philippines, including pilferage, earthquakes, typhoons, high humidity, wildcat strikes, vandalism, the threat of fire, the fear of political instability, and complex and unwieldy government procedures. The risk of fire in the Philippine factory was great because it was not close to any river, and water pressure in the area was usually very low.

### Financial Statements, Invoices, and Recordkeeping Functions

PM-Nassau provided the registered office for Carla Trading and performed the accounting services, maintained the corporate records, filed the annual reports with the registrar, and prepared the invoices based on advice from Mr. Ross. Such functions were clerical in nature and required an average of 4 to 5 hours a month to perform. PM-Nassau prepared no financial statements for Carla Trading for 1960 because, in its first year of operations, Carla Trading's recordkeeping was inadequate. PM-Nassau did suggest that the directors of Carla Trading adopt a statement of affairs as of January 1, 1961, prepared by PM-Nassau, which would form the basis for the 1961 and subsequent Carla Trading financial statements. Such a statement of affairs was adopted, and it shows that Carla Trading owned the property and business in the Philippines.

The Sycip financial statement for 1961 with respect to the Philippine operations was issued on March 30, 1962, and it was forwarded to Mr. Ross who transmitted it, together with a reconciliation of the No. 2 account, to PM-Nassau. In June 1962, Mr. Ross and Mr. Britchford discussed the preparation by PM-Nassau of the Carla Trading financial statement for 1961. Mr. Britchford reiterated his understanding that the Philippine business was an unincorporated branch of Carla Trading, and Mr. Ross advised him of what he believed to be the approval of the ownership arrangement by an agent of the respondent. PM-Nassau completed the Carla Trading financial statement for 1961 and issued it on July 20, 1962. In integrating the

results of the Philippine business into such financial statement, PM-Nassau used as the basis for the expenses of the Philippine business those set forth on the Sycip statement and in the No. 2 account reconciliations, and as the basis for the income of the Philippine business, the Carla Trading contract charges to Ross Glove for glove-manufacturing services. The assets, liabilities, income, and expenses of the Philippine business were treated as those of Carla Trading on the financial statement prepared by PM-Nassau for 1961. PM-Nassau also prepared the financial statements of Carla Trading for the years 1962 through 1966, and all such statements (and the books and records upon which they are based) treated the assets, liabilities, income, and expenses of the Philippine business in a similar manner. Such statements were prepared in the same basic manner as the 1961 statement, except that beginning with the changes in the ownership of the raw materials in 1963, the income of Carla Trading was based on the sales of finished gloves.

During the period 1960 through 1969, PM-Milwaukee prepared the audited financial statements of Ross Glove, and such statements treated the Philippine business as that of Carla Trading. Mr. Feurer, the audit manager, knew that Mr. Ross had filed documents under his own name in the Philippines, but Mr. Feurer still considered the Philippine operations to be a division of Carla Trading.

In 1967, fire destroyed the factory and inventory of the Philippine operation. Mr. Ross became involved in reestablishing the operation and practically stopped communicating with PM-Nassau. Such lack of communication made it impossible for PM-Nassau to prepare the Carla Trading financial statement for 1967 or subsequent years. The lack of communication continued, and in early 1969, PM-Nassau withdrew from the accounting and invoicing assignment for Carla Trading. However, PM-Nassau continued to serve as the registered office for Carla Trading. For the years 1967 through 1969, PM-Milwaukee prepared unaudited financial statements of Carla Trading based on reports prepared by Sycip. Each such financial statement treated the Philippine assets, liabilities, income, and expenses as those of Carla Trading.

During the period from 1960 through early 1969, invoices for Carla Trading were prepared by accountants and secretaries of PM-Nassau. In addition, some invoices may have been prepared in Sheboygan. Although Carla Trading maintained a registered office and, until 1969, its books and records, in Nassau, it had no factories or storage space in Nassau, and it made no shipments to or from Nassau. The original books and records of the Philippine operations were kept in the Philippines under the name of Ross Glove Manufacturing and later Carla Manufacturing. Copies of the documents involving Carla Trad-

ing were sent to Mr. Ross in Sheboygan. Mr. Ross conferred with Mr. Britchford in Nassau for approximately 1 day each year during the period from 1960 through 1966.

During the period 1960 to early 1963, the Philippine certificate of origin, required by the U.S. Bureau of Customs (Customs) to be filed as part of the Ross Glove Customs documentation, was signed "Carl Ross owner, Ross Glove Mfg.," because such certificate was also filed with the Philippine Government. Mr. Ross had previously disclosed to Customs that he considered Carla Trading to be the owner of the Philippine operation, and beginning in early 1963, when the certificate of origin was no longer filed with the Philippine Government, the Customs documentation showed Carla Trading as the producer in the Philippines. The documents filed by Mr. Ross with the Internal Revenue Service and the office of Foreign Direct Investments all show Carla Trading as the owner of the Philippine business.

During the period 1964 through 1969, Carla Trading paid dividends in the approximate total amount of $135,000 to shareholders Carla and Hugh Andrew Ross, who paid U.S. income taxes on such dividends. Although Miss Woepse was a director of Carla Trading from 1962 through 1969, she was not consulted with respect to activities regarding Carla Trading.

## Pricing

A. *Commissions.*—As earlier described, the books and records of Carla Trading and of Ross Glove show that Carla Trading sold sheepskins and rabbit linings to Ross Glove during the period from 1960 to 1962 at cost plus a commission. In 1961, the commissions were 5 percent of the cost of the sheepskins, which amounted to $9,524.35, and $2 per dozen for rabbit linings, which amounted to $18,040. Mr. Ross based the 5-percent rate on the statement of an individual who had purchased sheepskins for 40 years that a commission of 5 to 10 percent was in the proper range with variations within such range depending on the availability of skins at the time of the purchase. The commission for rabbit linings was based on the difference between the price of $7.40 to $8 per dozen charged to Ross Glove in 1961 by two independent sellers and the price of $5 per dozen at which Mr. Ross purchased similar linings in Belgium. In 1962, it was decided to raise the commission for sheepskins to 8 percent because of the tighter sheepskin market and to raise the commission for rabbit linings to $3.50 per dozen based on a higher domestic price for rabbit linings. Mr. Ross had never purchased sheepskins in the Middle East before 1959, although he had previously observed the quality of skins purchased by others.

B. *Manufacturing services—1961–62.*—During 1961, Carla Trading, on an interim basis, charged Ross Glove $5 per dozen pairs of

gloves f.o.b. Manila for the glove-manufacturing operations which it performed. At the end of 1961, Mr. Ross and Mr. Feurer of PM-Milwaukee reexamined the price to be charged for such services. To compute the price to be charged by Carla Trading, they began with the $4.30-per-dozen price charged by South Seas (NY). They analyzed the services which were performed by South Seas (Phil.) and found that the direct labor costs for such services in Sheboygan was $4.21, or approximately equal to the South Seas (NY) charge. Consequently, since Carla Trading furnished some services not supplied by South Seas (Phil.), Mr. Ross and Mr. Feurer decided to increase the $4.30 charge by an amount equal to the direct labor charges in Sheboygan for the additional services. Such charge for such services was $2.22. However, they failed to consider that the South Seas (NY) price included freight and insurance, whereas the Carla Trading price did not, and that the Carla Trading price included the sewing of the rabbit linings, whereas the South Seas (NY) price did not. The Sheboygan rate for this sewing operation was $1, and the freight and insurance charges were somewhat less. During the period from 1961 to 1969, the wage rate for Ross Glove was 4 times that in the Philippines.

Mr. Feurer suggested that Mr. Ross seek a quotation from an unrelated party to substantiate further the price which Ross Glove should pay. Mr. Ross contacted Mr. Henry D. Weiner. Mr. Weiner was the controlling shareholder of Henry D. Weiner Gloves, Inc., a U.S. corporation located in New York, N.Y., and of the American Philippine Manufacturing & Trading Corp., a Philippine corporation. The Philippine corporation owned no gloves. It simply sold services to the U.S. corporation, which resold such services to its customers. The price which such customers paid covered the expenses and profits of both the Philippine and New York corporations. In March 1962, the New York corporation quoted Mr. Ross a price of $6.50 per dozen pairs of gloves f.o.b. New York. Such price included the same functions as Carla Trading performed for Ross Glove, except that the quotation did not include the sewing of rabbit linings. Mr. Feurer then decided that $6.30 per dozen pairs of gloves was a reasonable price for Ross Glove to pay Carla Trading, and an agreement was entered into between such corporations, effective January 1, 1961, providing a rate of $6.30 per dozen pairs of gloves for manufacturing services performed in the Philippines. This agreement remained in effect through 1962.

C. *Gloves—1963-69.*—In May 1963, Carla Trading and Ross Glove entered into agreements fixing the prices, f.o.b. Manila, for the gloves manufactured by Carla Trading in the Philippines for Ross Glove. Such prices remained in effect through 1969, except as later modified. Such prices were based generally on the methods used by Customs to value gloves imported from the Philippines. Mr. Feurer believed

that these prices were reasonable for Ross Glove to pay, since it would cost it more to produce the same gloves in the United States.

Importations into the United States are entered with, and appraised by, Customs. 19 U.S.C. secs. 1488–1490. Because Ross Glove and Carla Trading were related parties, the Ross Glove importations were appraised at "constructed value." 19 U.S.C. sec. 1401a. Constructed value is defined as the sum of:

(1) the cost of materials * * * and of fabrication or other processing of any kind employed in producing such or similar merchandise * * * which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers * * * and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States. [19 U.S.C. sec. 1401a(d).]

During the period from 1963 through 1969, Ross Glove periodically furnished U.S. Customs with cost-of-production statements which were intended to reflect Carla Trading's direct costs. Customs determined the markup to be added to such costs to cover the allowable profit and overhead. For importations during 1963 and the first 4 months of 1964, the markup was 27 percent of direct production and material costs, and thereafter, 21 percent.

The following chart lists the values at which the imported gloves and linings of the Philippine operation were appraised by Customs from 1963 through 1969 and the price per dozen pairs at which such gloves and linings were sold by Carla Trading to Ross Glove:

| | Fur lined | | Knit lined | | Patch palm | | Fur linings | |
|---|---|---|---|---|---|---|---|---|
| | Carla Trading price | Appraisal (average) | Carla Trading price | Appraisal | Carla Trading price | Appraisal | Carla Trading price | Appraisal |
| 1963 | $26.00 | $26.01 | $19.50 | $18.24 | $12.25 | $11.87 | $6.00 | $6.87 |
| 1964 (through April) | 26.00 | 27.41 | 19.50 | 19.75 | 12.25 | 11.87 | 6.00 | 6.45 |
| 1964 (after April) | 26.00 | 26.31 | 19.50 | 18.82 | 11.50 | 11.31 | 6.00 | 6.15 |
| 1965 | 26.00 | 26.12 | 19.50 | 18.82 | 11.25 | 11.31 | 5.50 | 6.15 |
| 1966 | 26.00 | 27.48 | 19.50 | 20.13 | 11.25 | 11.31 | 5.50 | 6.16 |
| 1967 | 26.00 | 27.12 | 19.50 | 20.13 | 11.25 | 11.74 | 5.50 | 5.89 |
| 1968 | 25.50 | 24.87 | 20.05 | 22.25 | 11.25 | 11.74 | 5.00 | 5.90 |
| 1969 | 25.50 | 26.13 | 20.05 | 22.00 | 11.25 | 11.74 | 5.00 | 6.30 |

Cowhide men's gloves were added to the product line in 1968. During 1968 and 1969, such cowhide gloves had a Carla Trading price of $16.75 per dozen pairs and an appraisal value of $17.12.

The differences between the Carla Trading prices and the Customs appraisals were due to several circumstances. In some instances, Customs applied the markup to different costs than those used by Carla

Trading. At first, Mr. Ross thought that Carla Trading should charge more for the patch-palm gloves because they constituted a new product line, but the Carla Trading price was later reduced after it acquired experience with the manufacture of such gloves. Carla Trading charged less for the sewing of the fur linings because Mr. Ross thought that it was such a simple operation that the Customs markup was not entirely justifiable.

In 1967, because of the fire which destroyed the factory in the Philippines, Ross Glove purchased 459⅓ dozen pairs of knit-lined gloves from Henry D. Weiner Gloves, Inc., at the price of $27 per dozen pairs, which included $2.60 duty and 30 to 40 cents for shipping to New York. Such gloves were identical to those knit-lined gloves produced in the Philippine factory before the fire.

According to the records of Carla Trading, the Philippine operation had net sales and pretax operating profits as follows:

|      | Net sales | Operating profit | Percentage |
|------|-----------|------------------|------------|
| 1961 | $432,458.47 | $127,165.17 | 29.41 |
| 1962 | 525,152.87 | [1] 198,140.13 | 37.66 |
| 1963 | 873,083.80 | 193,237.14 | 22.13 |
| 1964 | 1,153,055.75 | 217,421.61 | 18.86 |
| 1965 | 1,256,719.20 | 90,846.52 | 7.23 |
| 1966 | 1,709,884.00 | 210,690.70 | 12.32 |
| 1967 | 1,283,989.00 | 119,509.13 | 9.31 |
| 1968 | 1,905,684.20 | 211,829.69 | 11.12 |
| 1969 | 1,795,504.94 | [2] 63,050.15 | 3.55 |

[1] During 1962, Carla Trading records also disclose the receipt of $7,209.61 in interest.
[2] During 1969, Carla Trading records also disclose a $10,800 gain on currency exchange.

In 1967, a fire loss of $356,575.51 was incurred, which amount is not included in the above figures.

The ratios of pretax operating profit to sales for Ross Glove for the period 1952 through 1969 are as follows:

| Date | Percent | Date | Percent | Date | Percent |
|------|---------|------|---------|------|---------|
| 1952 | 4.60 | 1958 | 1.80 | 1964 | (.23) |
| 1953 | 2.40 | 1959 | .00 | 1965 | (1.69) |
| 1954 | 2.72 | 1960 | 1.12 | 1966 | .07 |
| 1955 | 2.25 | 1961 | 1.15 | 1967 | (2.91) |
| 1956 | 1.88 | 1962 | 1.00 | 1968 | .31 |
| 1957 | 1.75 | 1963 | .23 | 1969 | 1.21 |

During 1961 through 1969, Ross Glove not only sold the gloves manufactured in the Philippines, but also sold gloves which it manufactured in Sheboygan. It made a profit on the sale of gloves which were produced in the Philippines; and during the period from 1963 through 1969, it incurred a loss on the sales of those produced in Sheboygan. In 1972, Ross Glove was the only company manufacturing gloves in the United States.

During the 1960's, Carla Trading produced 500,000 pairs of gloves, and by 1969, it had accumulated inventories amounting to $277,000, and increased its labor force from less than 50 to 300.

### Travel Expenses of the TeWinkel Family

In early 1962, Mr. TeWinkel, the American manager of the Philippine factory, took home leave and returned with his family to the United States for 6 weeks. Ross Glove paid a portion of Mr. TeWinkel's salary, and pursuant to an agreement with Mr. TeWinkel, it also paid all the travel expenses of the TeWinkel family in connection with such home leave. Mr. TeWinkel would not have accepted the Philippine position if home leave had not been provided. Mr. TeWinkel left his post as manager in 1963. Thereafter, Mr. Guillermo Roa became manager, and according to the books of Carla Trading, his entire salary was paid by Carla Trading.

### Prior Audit by Internal Revenue Service

In early 1962, an internal revenue agent conducted an audit of the Federal income tax returns of Ross Glove for the years 1959 and 1960 and the returns of Mr. and Mrs. Ross for the years 1958 through 1960. The agent and Mr. Ross had several meetings concluding with a final discussion in May 1962. At that time, Mr. Ross explained in detail the foreign operations of Carla Trading; that he was filing as a sole proprietor in the Philippines; and that the assets and business in the Philippines were owned by Carla Trading.

The agent also discussed the operations of Ross Glove and Carla Trading with Mr. Feurer of PM-Milwaukee. In his report, the agent described Carla Trading as the owner of the land and building in the Philippines "where it operated its glove manufacturing business" even though "as far as the Philippine government is concerned, the Manila operation is the sole proprietorship of Mr. Carl Ross." It also described the advances from Ross Glove to Carla Trading for the manufacturing operation and the existence and functioning of the No. 1 and No. 2 accounts with the Security Bank. Although he disallowed certain expenses of Ross Glove pertaining to the Philippine operation, the agent made no correlative adjustments on the individual return of Mr. and Mrs. Ross for 1960. Mr. Ross understood the agent's actions to mean that the agent had approved of the method of operation in the Philippines.

### Advances for Mother's Support

During the period from 1964 to 1968, Mr. Ross withdrew certain funds from Ross Glove which he charged to his drawing account, and

he deposited such funds in the guardianship account for the support of his mother. Mr. Ross intended that such deposits be treated as having been made by his children, Carla and Hugh Andrew, and they repaid the advances to Mr. Ross out of their Carla Trading dividends. Mr. Ross made such advances for the support of his mother in order to preserve intact a block of stock in the Vollrath Co. owned by her, which would pass to his children upon his mother's death.

## Notices of Deficiency

In his notices of deficiency to Mr. and Mrs. Ross for the years 1961 through 1963, 1965, 1966, 1968, and 1969, the respondent determined that the Philippine operation was a sole proprietorship and that its income was taxable to Mr. and Mrs. Ross. Alternatively, it was determined that the advances from Carla Trading to Ross Glove constituted a dividend to Mr. Ross. It was also determined that all or part of the underpayment of tax was due to fraud and that the section 6653(b) addition was applicable for all the years at issue. Alternatively, it was determined that if the fraud penalty is found not to be applicable for the year 1963, the section 6651(a) addition is applicable for failure to file a return within the time prescribed by law. It was also determined that Mr. and Mrs. Ross were liable for underpayment of their estimated tax for the years 1961 through 1963. The respondent now concedes that Mrs. Ross is not liable for any section 6653(b) addition.

In his notice of deficiency to Ross Glove for 1961 and 1962, the respondent determined that the transactions between it and Carla Trading were not at arm's length, and $27,564.35 for 1961 and $89,774.12 for 1962 were allocated to Ross Glove under section 482. It was also determined that Ross Glove was entitled to deduct as an ordinary and necessary business expense only $1,223.97 of the $4,283.88 claimed as travel expenses paid on behalf of Mr. TeWinkel. In his amended answer, the respondent determined that the Philippine operation was entitled to a profit of no more than 5 percent of its costs and allocated to Ross Glove, under section 482, an additional $84,354.15 in 1961 and an additional $99,224.98 in 1962. Alternatively, it was determined in the amended answer that Ross Glove overstated its costs by $111,918.50 in 1961 and $188,999.10 in 1962.

In his notice of deficiency for 1963, 1964, 1968, and 1969 to Ross Glove, the respondent determined that the transactions between Carla Trading and Ross Glove were not at arm's length, and based on a formula allowing Carla Trading a profit of 5 percent over costs, the respondent, under section 482, allocated income in the following amounts to Ross Glove: 1963, $152,026.66; 1964, $184,895.03; and 1968, $127,136.95. No allocation was made for 1969.

In his notice of deficiency for 1966 to Ross Glove, the respondent determined that the purchase of gloves from Carla Trading was not at arm's length, and based on a formula allowing Carla Trading a profit of 5 percent over costs, the respondent, under section 482, allocated $135,731.05 of income to Ross Glove. The respondent also determined that the corporation was liable for the section 6653(b) fraud penalty, but abandoned such position at trial.

OPINION

## 1. *Taxability—Income of Philippine Operation*

Of the many issues in this case, we consider first whether the income from the Philippine operation is taxable to Mr. and Mrs. Ross. The petitioners contend that Carla Trading owned and operated the Philippine business and that the income of such business is the income of Carla Trading. The respondent contends that Carla Trading was formed for the sole purpose of tax avoidance, that it did not conduct any business in the Philippines, and that Mr. Ross conducted the Philippine business as a sole proprietorship. The respondent also contends that regardless of whether Carla Trading conducted any business in the Philippines, it was Mr. Ross' skills, not Carla Trading's activities, which earned the income of the Philippine business and that such income is, therefore, taxable to Mr. Ross. The final alternative contended by the respondent is that the income of the Philippine operation is taxable to Mr. Ross under section 482.

If Carla Trading was organized for and engaged in substantial business activity, it will be recognized for tax purposes. *Moline Properties Inc.* v. *Commissioner*, 319 U.S. 436 (1943) ; *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964). In such a situation, the fact that tax motivations were involved in the formation of Carla Trading is not a basis for ignoring what is otherwise a viable business entity. As stated by this Court in *Nat Harrison Associates, Inc.*, 42 T.C. at 618:

Whether the primary reason for its existence and conduct of business was to avoid U.S. taxes or to permit more economical performance of contracts through use of native labor, or a combination of these and other reasons, makes no difference in this regard. Any one of these reasons would constitute a valid business purpose for its existence and conduct of business as long as it actually conducted business. * * *

See *Perry R. Bass*, 50 T.C. 595 (1968) ; *Sam Siegel*, 45 T.C. 566, 576–577 (1966) ; *Sanford H. Hartman*, 43 T.C. 105 (1964) ; compare *Kaspare Cohn Co. Ltd.*, 35 B.T.A. 646 (1937), appeal dismissed upon stipulation 109 F. 2d 1014 (C.A. 9, 1940) (in which the corporation did not conduct business and was a mere agency of another corporation).

From the outset, it was clear that Mr. Ross intended to form a foreign corporation to conduct business outside the United States. In July 1959, he decided to establish a manufacturing facility in the Philippines and explained to his attorneys and accountants, both in the Philippines and in the United States, that the facility would be owned and operated by a foreign corporation, which would also accumulate funds for foreign expansion and the carrying of large inventories. In order to be ready to fill orders for the production of gloves for the fall of 1960, Mr. Ross, on the advice of his attorney in the Philippines, purchased land, contracted to have a factory built, and filed an application to do business in the Philippines in his individual name, even though the Philippine operation was to be owned and operated by a foreign corporation, yet to be formed.

On the suggestion of PM-Milwaukee, Mr. Ross contacted PM-Nassau, and in December 1959, Carla Trading was incorporated in the Bahamas. According to an outline which Mr. Ross prepared for PM-Nassau, Carla Trading was formed for the basic purpose of manufacturing gloves in the Philippines. Common stock of Carla Trading having a par value of $25,000 was issued in consideration for the transfer by Mr. and Mrs. Ross of the factory and land in the Philippines, which cost $25,000. However, Mr. Selph informed Mr. Ross that he could not transfer record ownership to Carla Trading, and in August 1960, Mr. and Mrs. Ross, after consulting with PM-Nassau, executed a deed of trust to acknowledge that Carla Trading was the beneficial owner of the land and factory in the Philippines.

Manufacturing began in the Philippines in early 1960, and during the period from 1960 through 1969, a plant manager, who had the power to make production decisions, was in the Philippines. During such period, the only source of funds for the Philippine operation was the Carla Trading account, and the funds from this account were used to purchase raw materials and machinery, as well as to pay the manufacturing and administrative expenses of the Philippine operation. None of the funds from such account was diverted for the personal use of Mr. Ross. Invoices from Carla Trading to Ross Glove were generally prepared in the Bahamas, and Ross Glove remitted the appropriate amounts to the accounts of Carla Trading. The invoice prices were based on contracts executed by Ross Glove and Carla Trading in the Philippines, and the financial books and records of both Carla Trading and Ross Glove uniformly treated the Philippine operation as that of Carla Trading. Although Carla Trading's relation to the Philippine operation was not revealed to the Philippine Government, it was known by Mr. Ross' accountants and attorneys, and it was disclosed to Customs, and in 1962, to an agent of the respondent. PM-Milwaukee and PM-Nassau considered the Philippine operation

to be part of Carla Trading, and there is no question that Carla Trading has been a valid corporation in the Bahamas since its incorporation.

Carla Trading was organized for bona fide business reasons: to manufacture gloves and accumulate funds for foreign expansion, and during the 1960's, it produced 500,000 dozen pairs of gloves, accumulated inventories amounting to $277,000, and increased its labor force from less than 50 to 300. Under all the circumstances, we find that the Philippine operation was conducted by Carla Trading and that the income of such operation is the income of Carla Trading. Since Carla Trading was engaged in business, it does not matter that the corporation was incorporated in one country and conducted business in another, and therefore, we need not consider the respondent's argument that Carla Trading conducted no business in the Bahamas.

The respondent contends, however, that the close relationship between Ross Glove and the Philippine operation, Mr. Ross' activities on behalf of the Philippine operation, and the failure of Carla Trading's name to appear on documents filed in the Philippines indicate that Carla Trading did not conduct the business in the Philippines. A close relationship did exist between Ross Glove and Carla Trading. Both corporations were controlled by Mr. Ross, and Ross Glove purchased the entire output of the Philippine operation. As the sole customer of the Philippine operation, Ross Glove was the source of funds for the Philippine operation, and it made payments to the Carla Trading account on a regular basis, rather than only at the end of the glove-production cycle, when the gloves were shipped to the United States. Nonetheless, the existence of such a close relationship is not inconsistent with our finding that the Philippine operation was owned and operated by Carla Trading. See *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949); *Chelsea Products, Inc.*, 16 T.C. 840 (1951), affd. 197 F. 2d 620 (C.A. 3, 1952). This Court has recognized the existence of a wholly owned subsidiary which sold its entire output to its parent corporation and the existence of other subsidiaries which sold only the products of their parent corporations. See, e.g., *Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964); *Sanford H. Hartman, supra; Chelsea Products, Inc., supra.* Similarly, we will not ignore the existence of Carla Trading simply because the entire output of its operations in the Philippines was sold to a related corporation. Even if we were to ignore the existence of Carla Trading and conclude that the Philippine operation was an integrated part of Ross Glove, we might find that the Philippine operation was part of Ross Glove, but we would have no basis on which to find that it was operated as the sole proprietorship of Mr. Ross.

Mr. Ross' activities on behalf of the Philippine operation were extensive, but contrary to the respondent's contention, such activities

do not provide a basis for concluding that Carla Trading conducted no business in the Philippines. Mr. Ross was controlling shareholder, president, and a member of the board of directors of Carla Trading, and it is reasonable to expect that he would make the major business and financial decisions for the corporation. In analogous situations, where the corporation was formed for a valid business purpose, this Court has recognized that the business was that of the corporation and not that of the majority shareholder-officer who was active in the business. See, e.g., *John F. Nutt*, 39 T.C. 231 (1962), remanded on other grounds 351 F. 2d 452 (C.A. 9, 1965), certiorari denied 384 U.S. 918 (1966). The existence of a corporation formed for a valid business purpose should not be nullified merely because the shareholders are actively interested in assuring the success of the corporation. Indeed, in *National Carbide Corp.* v. *Commissioner*, 336 U.S. at 433, the Supreme Court refused to disregard the existence of a corporation even though it stated that:

Undoubtedly the great majority of corporations owned by sole stockholders are "dummies" in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually. * * *

In fact, Mr. Ross is actively engaged in the affairs of Ross Glove, and it has never been suggested that Ross Glove should not be recognized as a separate entity. We realize that Mr. Ross did not receive a salary for his activities with respect to Carla Trading, but the issue of whether an allocation of income, representing a reasonable salary, should be made to Mr. Ross is not before us.

The respondent also argues that the documents filed in the Philippines and the restrictions of Philippine law show that the income of the Philippine operation is not the income of Carla Trading. It is well established that the income of a business is taxed to the entity which actually conducts the business. *National Carbide Corp.* v. *Commissioner*, 336 U.S. at 436; *Blue Flame Gas Co.*, 54 T.C. 584, 598–600 (1970); *Bush Hog Manufacturing Co.*, *supra; Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964). Although statements filed with other governmental bodies may, in certain circumstances, be evidence of how a business is conducted, they are not conclusive. In *Howard R. Ward*, 48 T.C. 803 (1967), the FCC license necessary to operate a radio station was in the name of an individual, even though a corporation operated the radio station, and this Court held that the income of the radio station was taxable to the corporation. In *Robert E. Werner*, 7 T.C. 39 (1946), the taxpayer's wife held title to the corporation's assets and filed to do business with the State of Indiana as a sole proprietor; nevertheless, the husband actually conducted the business, and the income was found to be taxable to the husband. In *Nelson B. Updike*, 22 B.T.A. 12 (1931), the sole shareholder of a

corporation was a member of the Chicago Board of Trade who concealed from the board the fact that he was trading for the corporation in his own name so as to save on commissions, and this Court held that the income from such trading was taxable to the corporation. Cf. *Clay H. Brock*, 22 T.C. 284 (1954). Similarly, in *Nat Harrison Associates, Inc.*, *supra*, this Court held that income was taxable to the corporation which performed the work, and not to the corporation which signed the contract to do the work and agreed not to assign the contract.

The doctrine that income is taxed to the party which earns it is not affected by State law in the situation where the income is actually received by the earner. *R. W. Shaw III*, 59 T.C. 375 (1972); see *Kimbrell* v. *Commissioner*, 371 F. 2d 897, 902 fn. 15 (C.A. 5, 1967), affirming a Memorandum Opinion of this Court; *Ware* v. *Commissioner*, 159 F. 2d 542, 546 (C.A. 5, 1947), affirming a Memorandum Opinion of this Court; [3] cf. *Commissioner* v. *First Security Bank of Utah*, 405 U.S. 394, 405 (1972). Thus, in *E. C. Gatlin*, 34 B.T.A. 50 (1936), this Court held a taxpayer taxable on interest income which was usurious under State law. Cf. *James* v. *United States*, 366 U.S. 213 (1961). Furthermore, even the respondent has recognized that income from a transaction conducted in apparent violation of foreign law is taxable to the entity which earns it. In Rev. Rul. 55–234, 1955–1 C.B. 217, a law of country X prohibited a corporation from importing goods into that country, and in order to avoid the law, one of the officers of the corporation established a sole proprietorship and acted as shipping agent for the corporation in country X. The officer received no compensation, the corporation did the work and financed the shipments, and the ruling treated the income as that of the corporation.

Mr. Ross was in essence Carla Trading's nominee for the purpose of filing in the Philippines. Contrary to the respondent's contention the validity of a nominee arrangement is not dependent on a formal contract, but depends on the facts and circumstances of the case. See *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422, 437–438 (1949); *Hellman* v. *Glenn*, 36 F. Supp. 423 (W.D. Ky. 1941). We also reject the contention that Carla Trading was prohibited from doing business in the Philippines. Under its charter, Carla Trading could do business anywhere in the world, and the respondent has referred to no law which prohibits a Bahamian corporation from doing business in the Philippines. Furthermore, as Carla Trading was organized before glove production commenced, there was no need to transfer formally the Philippine business to the corporation. Although Carla Trading

---

[3] See *Allenberg International Cotton Co.*, 31 T.C.M. 757 (1972), 41 P–H Memo T.C. par. 72,152 (involving Mexican law); *Frank Ronkowski*, 15 T.C.M. 1441, 25 P–H Memo. T.C. par. 56,276 (1956).

may not have been able directly to hold title to real property, it is unclear as to whether the deed of trust arrangement was void. Mr. Selph knew of such arrangement and apparently did not object. In any event, the income of the Philippine operation arose out of the active conduct of business, not out of the ownership of real property, and under such circumstances, courts have uniformly held the income to be taxable to the entity which conducts the business. *Bartell Hotel Co.*, 32 T.C. 311 (1959); *Robert E. Werner, supra; Albert Nelson*, 6 T. C. 764 (1946); see *L. T. Campbell, Inc.* v. *Commissioner*, 159 F. 2d 629 (C.A. 5, 1947), affirming a Memorandum Opinion of this Court.

In addition, the respondent asserts that Mr. Ross is estopped from denying that the Philippine operation was conducted as a sole proprietorship. Although Carla Trading's name did not appear on documents filed in the Philippines, it did appear on all documents filed in the United States, except certain documents filed with Customs, and prior to filing such documents with Customs, Mr. Ross notified Customs that Carla Trading was doing business in the Philippines. At least two competitors of Ross Glove were not aware of the existence of Carla Trading, but there is no requirement in the tax law that a corporation must reveal its method of operation to its competitors. Similarly, the fact that certain employees of Carla Trading and Ross Glove may not have understood the relationship between Ross Glove and Carla Trading does not indicate that Mr. Ross consistently treated the Philippine operation as a sole proprietorship. It was not the duty of such employees to understand such relationship. Considering all the evidence, including the disclosures made by Mr. Ross to the respondent's agent in 1962, we find that the petitioners are not estopped from claiming that Carla Trading conducted the Philippine operation. There simply has been no showing that the respondent was misled by the petitioner. *Northport Shores, Inc.*, 31 B.T.A. 1013 (1935). Moreover, the respondent did not plead estoppel, and estoppel is an affirmative defense which must be raised in the pleadings. *Alfred Fortugno*, 41 T.C. 316, 323 (1963), affd. 353 F. 2d 429 (C.A. 3, 1965); *Lodi Iron Works, Inc.*, 29 T.C. 696, 701–702 (1958); *Estate of Thomas E. Steere*, 22 T.C. 79, 82 (1954), affirmed sub nom. *Rhode Island Hosp. Tr. Co.* v. *Commissioner*, 219 F. 2d 923 (C.A. 1, 1955); *El Dorado Oil Works*, 46 B.T.A. 994, 998 (1942); *Tide Water Oil Co.*, 29 B.T.A. 1208, 1221 (1934); *Bamberg Cotton Mills Co.*, 8 B.T.A. 1236, 1244 (1927); see Rule 14(b), Tax Court Rules of Practice.

We also reject the respondent's contention that even if Carla Trading was a viable entity, it was Mr. Ross, and not Carla Trading, who earned the income. The income of the Philippine operation arose out of the production of 500,000 dozen pairs of gloves, and such gloves were manufactured by the 300 employees of Carla Trading who worked under

the direction of the plant manager in the Philippines. The making of major business and financial decisions by Mr. Ross does not result in his being considered the earner of the income; he was simply acting as a shareholder-officer. See *John F. Nutt*, 39 T.C. 231 (1962), remanded on other grounds 351 F. 2d 452 (C.A. 9, 1965), certiorari denied 384 U.S. 918 (1966) ; see also *National Carbide Corp.* v. *Commissioner*, *supra*. The cases relied on by the respondent involve situations where the corporation or trust did nothing to earn the income and where assignment-of-income principles were, therefore, applicable. See *Lucas* v. *Earl*, 281 U.S. 111 (1930) ; *George D. Seyburn*, 51 T.C. 578 (1969). In some cases, the corporation or trust was simply a conduit through which a sale was made for the benefit of the controlling shareholder, and the Court treated such shareholder as having made the sale. *James M. Hallowell*, 56 T.C. 600 (1971) ; *Arnold Malkan*, 54 T.C. 1305 (1970). In other cases, the income was taxable to the shareholder because the personal services of the shareholder produced the income, and the corporate entity did not perform any significant business activities. *Johansson* v. *United States*, 336 F. 2d 809 (C.A. 5, 1964) ; *Jerome J. Roubik*, 53 T.C. 365 (1969) ; *Richard Rubin*, 51 T.C. 251 (1968), reversed and remanded 429 F. 2d 650 (C.A. 2, 1970), on remand 56 T.C. 1155 (1971), affirmed per curiam 460 F. 2d 1216 (C.A. 2, 1972) ; cf. *Borge* v. *Commissioner*, 405 F. 2d 673 (C.A. 2, 1968), affirming on this issue a Memorandum Opinion of this Court; *Lloyd F. Noonan*, 52 T.C. 907 (1969), affirmed per curiam 451 F. 2d 992 (C.A. 9, 1971). The distinction between such cases and the present one is clearly set forth in *American Savings Bank*, 56 T.C. 828 (1971). In that case, the individual petitioners, in their capacity as officers or directors, exerted some influence over the earning of sales commissions by the corporation; but the Court found that the sales commissions were earned by the corporation and consequently were not taxable to the individuals. On the other hand, they were found to be taxable on the fees for management services, because they performed the management services, and there was no showing that they were doing so as employees of the corporation. In the present case, Mr. Ross did not manufacture the gloves; he simply made the basic business decisions.

The final reason given by the respondent for taxing the income of the Philippine operation to Mr. Ross is that such income is allocable to him under section 482. However, the petitioners contend that such issue was not timely raised, and that they have been surprised and harmed by such untimely presentation of the issue. The issue was not raised in the notices of deficiency; nor was it raised when the respondent amended his answers to include certain section 482 allocations between Ross Glove and Carla Trading. The issue was first mentioned by the respondent in his 5-page opening statement at the trial, along with several other new issues, most of which have apparently been abandoned,

and it was merely stated as an allocation "to Carl Ross, the sole proprietor in the Philippines." Considering the multitude of issues of this case and the extensive time and effort required to prepare for trial of such issues, the respondent's failure to raise this issue in his notices of deficiency or his amendment to his answers, and the vague and obscure manner of presenting the issue in his opening statement, we find that the respondent did not timely raise the issue and that the petitioners were, thereby, substantially prejudiced. Accordingly, we will not consider the issue. Compare *Estate of Akos Anthony Horvath*, 59 T.C. 551 (1973), and *Richard R. Riss, Sr.*, 57 T.C. 469 (1971), affd. 478 F. 2d 1160 (C.A. 8, 1973) (in which prejudice was found) with *Richard Rubin*, 56 T.C. at 1163, and *Nat Harrison Associates, Inc.*, 42 T.C. at 617–618 (in which no prejudice was found).

### 2. *Taxability—Advances by Carla Trading to Ross Glove*

Next, we consider the issue of whether Mr. Ross received constructive dividends as a result of certain advances by Carla Trading to Ross Glove. As of December 31, 1962, Ross Glove had an account payable to Carla Trading in the amount of $318,107 representing funds advanced by Carla Trading to Ross Glove and amounts due to Carla Trading as a result of the services performed by it for Ross Glove. Such account was not paid in cash, but Ross Glove gave Carla Trading its 10-year note in payment of the account. The respondent questions whether there was a bona fide obligation to pay the account and argues that the arrangement resulted in a constructive dividend to Mr. Ross.

It is well established that a corporate distribution can be treated as a dividend if it is made for the personal benefit of a shareholder or in discharge of a personal obligation of a shareholder. *Walter K. Dean*, 57 T.C. 32 (1971); *W. B. Rushing*, 52 T.C. 888, 893 (1969), affirmed without discussion of this issue 441 F. 2d 593 (C.A. 5, 1971); *Edgar S. Idol*, 38 T.C. 444 (1962), affd. 319 F. 2d 647 (C.A. 8, 1963); *Challenge Manufacturing Co.*, 37 T.C. 650 (1962). If funds are advanced from one corporation to a related corporation, such advances may constitute a constructive dividend taxable to the shareholder who owns the two corporations if it is found that the advances were made primarily for his benefit. *W. B. Rushing*, 52 T.C. at 893. The constructive-dividend doctrine is not applicable merely because Mr. Ross was a controlling shareholder in both Carla Trading and Ross Glove; the rule is only applicable if it appears that the advances were made primarily for his benefit.[4]

---

[4] *Joseph Lupowitz Sons, Inc.*, 31 T.C.M. 1169, 41 P–H Memo. T.C. par. 72,238 (1972), on appeal (C.A. 3, Apr. 30, 1973); see *Christie Coal & Coke Co., Inc.*, 28 T.C.M. 498, 38 P–H Memo. T.C. par. 69,092 (1969); *Old Dominion Plywood Corp.*, 25 T.C.M. 678, 35 P–H Memo. T.C. par. 66,135 (1966).

Mr. Ross did not personally utilize the advances, and they were not expended for his personal benefit or to discharge his personal obligation. Any benefit which he received was, at most, derivative or indirect in nature. *Walter K. Dean, supra; W. B. Rushing, supra.* There were continuing business transactions between Carla Trading and Ross Glove—Carla Trading was manufacturing gloves, and Ross Glove purchased its entire output for resale in the United States. There may have been substantial business reasons for Carla Trading to make advances under such circumstances and to forbear collecting the amounts due it. We, therefore, find that Mr. Ross did not receive a constructive dividend as a result of the advances which were made to Ross Glove.[5] In view of that finding, it is unnecessary for us to decide, for purposes of this issue, whether the account payable on the books of Ross Glove represented a bona fide debt.

### 3. *Adjustments in the Prices Charged by Carla Trading*

The third issue for decision is whether under section 482, the respondent can allocate some of the income of Carla Trading to Ross Glove by adjusting the prices charged by Carla Trading. In 1961 and 1962, Carla Trading allegedly purchased sheepskins and rabbit linings in Europe and the Middle East and sold them to Ross Glove; it also performed sewing services for Ross Glove and made advances to it. Since the activities of Carla Trading during those years were different from its activities in subsequent years, it is necessary to consider separately the respondent's adjustments for such years.

Section 482 provides:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAX-PAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

Ordinarily, when the respondent makes a determination under such section, any petitioners who challenge it have the burden of proving that he acted unreasonably, arbitrarily, or capriciously. *Baldwin-Lima-Hamilton Corporation* v. *United States*, 435 F. 2d 182 (C.A. 7,

---

[5] In so holding, we are not deciding the issue of whether Mr. Ross received a constructive dividend as a result of the sec. 482 pricing adjustments discussed in part 3 of this opinion. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 15.06, pp. 15–33 (1971). Such issue has not been raised in this case.

1970) ; *Philipp Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F. 2d 53 (C.A. 2, 1970), affirming 52 T.C. 240 (1969) ; *Kerry Investment Co.*, 58 T.C. 479 (1972), on appeal (C.A. 9, Oct. 27, 1972) ; *Huber Homes, Inc.*, 55 T.C. 598 (1971). However, in this case, there is a dispute as to who has the burden of proof with respect to the adjustments made by the respondent for the years 1961 and 1962.

In his notice of deficiency, the respondent allocated $27,564 of income for 1961 and $89,774 for 1962 from Carla Trading to Ross Glove. In his amended answer, the respondent determined that all of the transactions between Carla Trading and Ross Glove were not at arm's length and that Carla Trading was not entitled to a greater profit on its operations than 5 percent of its total manufacturing, administration, and materials costs. The amounts allocated in the notice exactly equaled the amounts which Carla Trading charged for commissions on the sales of the sheepskins and rabbit linings, and the petitioner stated that it assumed that the arm's-length nature of the entire amount of those commissions, and only those commissions, was being challenged by the respondent. Although the respondent argues that by his notice, he intended to challenge all the activities of Carla Trading, we think that the petitioner was reasonable in its understanding of the notice, and accordingly, we find that the notice put in issue only the commissions charged by Carla Trading for the sales of the sheepskins and rabbit linings. We also reject the petitioner's argument that by his amended answer, the respondent abandoned his original adjustment, for it seems clear that he did not intend any such abandonment and that the parties have fully considered and argued the issue. See *Richard Rubin*, 51 T.C. 251 (1968), reversed and remanded 429 F. 2d 650 (C.A. 2, 1970), on remand 56 T.C. 1155 (1971), affirmed per curiam 460 F. 2d 1216 (C.A. 2, 1972) ; *Nat Harrison Associates, Inc.*, 42 T.C. 601, 617–618 (1964) ; compare *Richard R. Riss, Sr.*, 57 T.C. 469 (1971), affd. 478 F. 2d 1160 (C.A. 8, 1973). Thus, the petitioner has the customary burden of proof as to the commissions charged by Carla Trading, but the respondent has the burden of proof as to the other adjustments made by him in his amended answer for the years 1961 and 1962. *Lewisville Investment Co.*, 56 T.C. 770, 781 (1971).

The petitioners contend that Mr. Ross, acting on behalf of Carla Trading, purchased the sheepskins and rabbit linings with funds from the Carla Trading Bank of Montreal account, that Carla Trading took title to such skins and linings, and that it sold such skins and linings to Ross Glove, which took title to the rabbit linings before they were imported into the Philippines and title to the sheepskins before they were imported into the United States. Mr. Ross did testify that he was acting on behalf of Carla Trading, and the skin and lining suppliers apparently did invoice Carla Trading. However, although Mr.

Ross purchased the skins and linings, he never received a salary from Carla Trading for such services. Mr. Ross also testified that Carla Trading paid only his Manila hotel expenses; thus, Carla Trading, for which he was allegedly performing services, apparently did not pay the costs of his trips to Belgium and Turkey to purchase the skins and linings. He even testified that he was purchasing the skins and linings for Ross Glove, although not directly, and in fact, all of the skins and linings purchased by Mr. Ross during 1961 and 1962 ultimately became the property of Ross Glove before any work was performed on them. Under such circumstances, even if we accept the contention that Carla Trading held title to the skins and linings for some period of time, it is clear that it only acted as a conduit in passing title to Ross Glove, and since no work was performed on the skins or the linings by Carla Trading before title passed to Ross Glove, it is also clear that there was no business purpose for Carla Trading holding title to the skins and linings. The petitioner argues that there was economic reality in Carla Trading holding title because it assumed the risk of shipment to the United States for the sheepskins and to the Philippines for the rabbit linings. We have found no evidence which clearly demonstrates that Carla Trading ever held title to the skins or the linings when they were being shipped, nor any reason for transferring title to Carla Trading for such period. Considering the lack of a business purpose for Carla Trading holding title and the failure to prove that Carla Trading incurred expenses in connection with the transfer of the skins and linings, we find that the petitioner has utterly failed to prove that the respondent was unreasonable in denying Ross Glove deductions for the commissions paid to Carla Trading for the sheepskins and rabbit linings. See *United States Gypsum Co.* v. *United States*, 452 F. 2d 445, 450 (C.A. 7, 1971); cf. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334 (1945); *Northwest Acceptance Corp.*, 58 T.C. 836, 845 (1972); *S & M Plumbing Co.*, 555 T.C. 702, 708 (1971).

As to the determination that Carla Trading's prices for its sewing services were excessive and that such prices should not exceed costs plus a 5-percent markup for profit, the respondent has the burden of proof. Under section 1.482–2(b) of the Income Tax Regulations, the respondent may make appropriate allocations to reflect the amount which was or would have been charged for the same or similar services in independent transactions between unrelated parties under similar circumstances. See *Baldwin-Lima-Hamilton Corporation* v. *United States*, 435 F. 2d at 185; *Commissioner* v. *Chelsa Products, Inc.*, 197 F. 2d 620, 623 (C.A. 3, 1952), affirming 16 T.C. 840 (1951); *Marc's Big Boy-Prospect, Inc.*, 52 T.C. 1073, 1094–1095 (1969), affirmed sub nom. *Wisconsin Big Boy Corporation* v. *Commissioner*, 452 F. 2d 137 (C.A. 7, 1971); *Hamburgers York Road, Inc.*, 41 T.C. 821, 835

(1964). The respondent attempted to support his adjustments by relying upon such authority and the testimony of Mr. Casey, Mr. Ross' negotiations with the Central Bank, an appraisal report of Appraisers (Philippines) Inc., and Ross Glove's sale of inventory to Carla Trading.

Mr. Casey, chief executive officer of the National Association of Glove Manufacturers, Inc., testified that the American glove-manufacturing industry is not a high-earning industry, and that it rarely has a year in which gross profit exceeds 3 percent of sales. He did not testify as to the rate of profit earned by a Philippine manufacturer, and during the 1960's, the glove manufacturing, which had been done in this country, was increasingly being performed in the Philippines, where greater profits could be earned. Indeed, by 1969, only one manufacturer, Ross Glove, produced gloves in this country. Moreover, considering the risks of operating in the Philippines, a manufacturer would require a greater rate of profit to do business in the Philippines than in the United States. Under such circumstances, Mr. Casey's testimony does not provide a basis for the respondent's determination.

In 1960, Carla Trading negotiated with the Central Bank a markup of 20 percent of direct costs, which included 5 percent for profit and 15 percent for overhead. Such markup, which was increased to 30 percent by the Philippine Government in 1965, was the minimum allowed by the Philippine Government for glove manufacturers. The manufacturers sought the lowest allowable markup so as to avoid the strict Philippine currency controls. In fact, Mr. Ross was advised by his Philippine accountants that it was common to negotiate low markups and avoid both Philippine currency controls and Philippine income tax. Under these circumstances, the negotiated markup cannot be said to reflect the reasonable or arm's-length price for the services of Carla Trading. There is no merit in the respondent's argument that Carla Trading benefited in the Philippines from the representations it made to the Central Bank and that it should have to live with the burdens of such representations. The respondent has neither pleaded estoppel nor shown that he detrimentally relies on such representations. See *Alfred Fortugno*, 41 T.C 316, 323 (1963), affd. 353 F. 2d 429 (C.A. 3, 1965); *Northport Shores, Inc.*, 31 B.T.A. 1013 (1935). Furthermore, there is nothing in section 482 or the regulations thereunder to indicate that the arm's-length standard of section 482 is to be ignored simply because of representations made in foreign countries.

Similarly, the statements in an appraisal report of Appraisers (Philippines) Inc. that Carla Trading earns a constant yearly profit of 5 percent on its "invested capital," and other similar companies earn similar or lesser amounts, fail to support the respondent's determination. In the first place, such statements seem to be incorrect. Accord-

ing to its financial statements, the accuracy of which has not been challenged by the respondent, Carla Trading earned a much greater profit than 5 percent of its sales, and the amount of its sales substantially exceeded the amount of its invested capital. It may be that the information in the appraisal report was based on the rates negotiated with the Central Bank. Therefore, the report, like the Central Bank rates, is not an accurate measure of the profit which was earned in providing services similar to those made by Carla Trading.

Nor does the sale of inventory in 1962 at cost plus 5 percent provide a basis for the respondent's determination. Such sale was made *to* Carla Trading, not *by* Carla Trading. The sale was of raw materials and sewn gloves, and apparently Ross Glove simply sold such items to Carla Trading at the amounts which it paid for raw materials, including shipping charges, plus 5 percent. The 5-percent markup was not at all intended as compensation for services similar to those performed by Carla Trading.

Although the respondent has failed to justify the adjustments made by him, he has shown that Carla Trading's price was not arm's length. Carla Trading computed its charge of $6.30-per-dozen pairs of gloves for the services performed by it by reference to the price of $4.30-per-dozen pairs of gloves f.o.b. New York which South Seas (NY) charged and by adding $2 to such price to cover the additional services performed by Carla Trading. It also attempted to justify such price by the bid of Henry D. Weiner Gloves, Inc., of $6.50-per-dozen pairs of gloves f.o.b. New York. However, in making its computation, Carla Trading did not consider that it sewed the rabbit linings and that South Seas (Phil.) did not, or that the South Seas (NY) price included freight and insurance expenses, which its price did not. The direct labor cost in Sheboygan of sewing rabbit linings was $1-per-dozen pairs of gloves, and the costs of freight and insurance per dozen pairs of gloves was somewhat less than that amount.

The respondent argues that, based on *Lufkin Foundry & Machine Co.* v. *Commissioner*, 468 F. 2d 805 (C.A. 5, 1972), reversing a Memorandum Opinion of this Court, rehearing 468 F. 2d 808 (C.A. 5, 1972), a taxpayer may not establish an arm's-length price based on internal transactions and that, therefore, as a matter of law, Carla Trading's price is not arm's length. *Lufkin* simply held that under the circumstances of that case, a taxpayer could not establish the arm's-length nature of its prices by relying solely on its internal prices. In the present case, Carla Trading did not rely solely on its prices; it also considered the prices of South Seas (NY) and Henry D. Weiner Gloves, Inc.

The respondent also argues that South Seas (NY) is not comparable to Carla Trading. It is clear that the South Seas (NY) price included the expenses and profits of two corporations. The president of South

Seas (NY) and South Seas (Phil.) testified that South Seas (Phil.) provided the services to South Seas (NY) at a profit and that South Seas (NY) resold such services to Ross Glove at a higher price, which included its costs and profit. Mr. Weiner's bid also included the expenses and profits of two corporations. It is apparent that Carla Trading's price should not include the costs and profit of a United States sales agency, and that it must be adjusted downward.

The respondent suggests that other downward adjustments in the Carla Trading price are necessary to account for the size of Ross Glove's order to Carla Trading, the expenses incurred by South Seas (Phil.) which Carla Trading did not incur, the risks which Carla Trading did not have to incur, and the high-profit rate of Carla Trading. Quantity discounts are common in contracting for sewing services, and South Seas (NY) considered the Ross Glove order in 1959 to be a small one. Although Mr. Weiner's bid of $6.50-per-dozen pairs of gloves was based on what he considered to be a large order, such order was not the equivalent of an order for whatever his Philippine operation could produce. Therefore, it appears that Carla Trading's price should be adjusted downward to take account of the size of the Ross Glove orders.

The expenses which Carla Trading did not incur but which South Seas (Phil.) incurred, allegedly included startup expenses, the payment of its chief executive's salary, and Philippine taxes. However, it appears that both South Seas (Phil.) and Carla Trading had similar startup expenses. Moreover, Mr. Weiner's Philippine operation was apparently experienced in sewing gloves, and the quotation of Henry D. Weiner Gloves, Inc., was not less than the price of Carla Trading despite such experience. Under all the circumstances, we cannot find that the startup costs of South Seas (Phil.) were significantly different from those of Carla Trading in 1961 or 1962 or from those of Mr. Weiner's Philippine operation. Although Carla Trading did not pay Mr. Ross a salary, it did pay part of the salary of an American plant manager during 1961 and 1962, and there has been no showing that South Seas (Phil.) paid all or even part of Mr. Lipetz's salary. Similarly, there has been no showing that South Seas (Phil.) paid substantial taxes in the Philippines.

The risks assumed by Carla Trading were not significantly different from those assumed by South Seas (Phil.). Both corporations provided labor services, both paid the expenses with advances from their American corporation, and neither owned the materials which they sewed.

The respondent's reliance on the high profit of Carla Trading in 1961 of approximately 130 percent of manufacturing costs and in 1962 of approximately 150 percent does not give the respondent in-

dependent grounds for reducing Carla Trading's prices, since he has not shown the profits of similar corporations. Moreover, the suggestion of the respondent that South Seas (NY) sold some products at a loss and that it might have sold the sewing services to Ross Glove at a high price to offset the loss on the sale on such products fails to support the respondent's determination. There is no evidence to indicate that the price to Ross Glove included such an offset, and the respondent's suggestion is mere speculation.

We, therefore, are presented with a situation in which neither the respondent's determination nor the petitioner's price accurately reflects an arm's-length price. Under such circumstances, the duty to find an arm's-length price rests with the Court. *American Terrazzo Strip Co.*, 56 T.C. 961 (1971). The respondent, who has the burden of proof with respect to this adjustment, has shown that Carla Trading's pricing failed to take into account the existence of a "middle man" in the South Seas (NY) price and the quantity of Ross Glove's order. Yet, he has not shown with specificity the amount by which Carla Trading's price should be reduced. Considering all the evidence and bearing heavily on the respondent, we find that the price should be reduced by 20 percent.

In support of his determination with respect to 1961 and 1962, as set forth in his amended answer, the respondent also takes the position that the interest which Ross Glove accrued for 1962 on its account payable to Carla Trading was not deductible because there was not an intent on the part of Ross Glove to repay the debt when it was incurred. The respondent, who has the burden of proof with respect to this adjustment, has not presented any evidence which directly refers to the intent of Ross Glove when the 1961 advances were made; rather, he relies on three events which occurred in 1962.

On June 4, 1962, Mr. Ross explained to his accountant in the Bahamas that the loss which the Philippine operation showed in 1960 for Philippine purposes was a paper loss and that the payment which Ross Glove made to cover such loss was part of a paper deal which should be ignored for the purposes of integrating the balance sheet of the Philippine operation and the reconciliation of the No. 2 account into the balance sheet of Carla Trading. It is clear that such explanation was in no way related to the bona fide nature of the advances from Carla Trading to Ross Glove.

At the end of 1962, the account payable to Carla Trading for 1961 and additional amounts accrued during 1962 were included in a 10-year non-interest-bearing note. The respondent contends that such 10-year period was not connected with any specific event. However, he has failed to show why the 10 years must be connected to a specific event.

At the end of 1962, Ross Glove also sold inventory to Carla Trading and established an account receivable for $165,063.10 on its books, which was reduced during 1963 to $46,899.68 and eliminated in 1964, as gloves were purchased from Carla Trading. The respondent argues that instead of establishing the account receivable, the parties should have credited $165,063.10 to the debt of Ross Glove and that the failure to do so indicates the sham nature of the claimed debt. Ross Glove may have been short of funds in 1963 and 1964, and using the account receivable to pay for the gloves purchased by it in those years avoided the necessity of it borrowing other funds. Thus, we cannot conclude that it was unreasonable for Ross Glove to establish an account receivable or that such establishment indicates that the advances by Carla Trading did not give rise to a bona fide debt.

The respondent has presented no other arguments, and we must find that he has failed to show that the debt of Ross Glove was not bona fide. We, therefore, hold that the respondent's adjustment under section 482 disallowing Ross Glove a deduction for interest has not been sustained.

From 1963 through 1969, Carla Trading owned the materials in the Philippines, and it sold the gloves which it manufactured to Ross Glove. Pursuant to section 482, the respondent determined that the arm's-length price for sales between Carla Trading and Ross Glove was Carla Trading's total costs plus 5 percent, and he allocated additional gross income to Ross Glove in the years 1963, 1964, 1966, and 1968. Such adjustments were set forth in the notices of deficiency, and therefore, they must be upheld unless the petitioner shows that they were unreasonable, arbitrary, or capricious. *Baldwin-Lima-Hamilton Corporation* v. *United States*, 435 F. 2d 182 (C.A. 7, 1970); *Philipp Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F. 2d 53 (C.A. 2, 1970), affirming 52 T.C. 240 (1969); *Kerry Investment Co.*, 58 T.C. 479 (1972), on appeal (C.A. 9, Oct. 27, 1972); *Huber Homes, Inc.*, 55 T.C. 598 (1971).

Section 1.482–1(b)(1) of the Income Tax Regulations provides in part:

The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

*Local Finance Corporation* v. *Commissioner*, 407 F. 2d 629 (C.A. 7, 1969), affirming 48 T.C. 773 (1967); *Woodward Governor Co.*, 55 T.C. 56 (1970). The regulations provide three basic methods for determining the arm's-length price in the sale of tangible property: The comparable uncontrolled price method, the resale price method, and the

cost-plus method. Sec. 1.482-2(e)(1)(ii), Income Tax Regs. Neither party seriously contends that the comparable uncontrolled price or resale price method is applicable in this case, and we shall consider only the cost-plus method. Under such method, the arm's-length price is determined by adding to the seller's costs of producing the property a gross-profit margin, expressed as a percentage of costs and equal to the gross-profit margin earned on the uncontrolled sale or sales of property most similar to the controlled sale in question. Sec. 1.482-2 (e)(4)(i),(iii), Income Tax Regs. The costs which enter into the computation include direct and indirect costs, if the comparable gross-profit margin is based on such costs, and only direct costs, if the comparable profit margin is based only on direct costs. Sec. 1.482-2(e)(4) (ii), Income Tax Regs. If the most similar sale, from which gross-profit percentage is derived, differs in any material respect from the controlled sale, the arm's-length price which is computed by applying such percentage must be adjusted. A difference for such purpose is one which has a definite and reasonably ascertainable effect on price. Sec. 1.482-2(e)(4)(v), Income Tax Regs. In the absence of data on the gross-profit margins of particular sales, it may be appropriate to refer to gross-profit percentage in the particular industry. Sec. 1.482-2(e)(4)(v), Income Tax Regs.

The petitioner contends that the markup used by Customs in valuing gloves imported from the Philippines is the proper gross-profit margin to be used in applying the cost-plus method of the regulations, and that such markup demonstrates the unreasonableness of the respondent's determination. The respondent argues that the testimony of Mr. Casey, Mr. Ross' negotiations with the Central Bank, and the appraisal report of Appraisers (Philippines) Inc. all indicate that his determination was reasonable. He also contends that Customs valuations are unreliable and cannot form the basis for a determination of an arm's-length price.

The evidence which the respondent relies upon to support this adjustment is the same evidence which he used to support his adjustment for 1961 and 1962. For the same reasons that we found such evidence failed to support the other adjustment, we also find that it fails to establish the reasonableness of his adjustment with respect to 1963, 1964, 1966, and 1968. Indeed, the Customs valuations clearly show the unreasonableness of the respondent's determination. Compare *Eli Lilly & Co.* v. *United States*, 372 F. 2d 990 (Ct. Cl. 1967).

Pricing between related parties may raise difficulties in the administration of both the Customs laws and the internal revenue laws. The methods adopted by Customs and the respondent to meet such difficulties are quite similar. Under section 482, an arm's-length price is based

on comparable sales between unrelated persons, when such information is available: Sec. 1.482–2(e)(1)(i), Income Tax Regs. In like manner, Customs bases its valuation on comparable sales between unrelated persons, when such information is available. 19 U.S.C. sec. 1401a. When such information is not available, imports are appraised at a constructed value, which is equal to the cost of materials and processing of any kind employed in producing such or similar merchandise, the cost of packing the merchandise that is to undergo appraisement, and

an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States * * * [19 U.S.C. sec. 1401a(d).]

Such markup is clearly quite similar to the gross profit margin which is used in the cost-plus method under section 482. For gloves imported from the Philippines during 1963 and the first 4 months of 1964, Customs established a markup of 27 percent of material and production costs; and for gloves imported during the remainder of 1964 through 1969, such markup was 21 percent. Since Customs is directed by law to appraise imports in accordance with the provisions of 19 U.S.C. sec. 1401a, we must assume, in the absence of contrary evidence, that such duty was carried out in establishing the markups. Considering the similarity between the constructed value computation of Customs and the cost-plus method of section 482, we find that the markups used by Customs in computing the value of gloves imported by Ross Glove may serve as a basis for determining an arm's-length price under section 482. Such markups may be used because they are the best available evidence as to the amounts that a seller would receive to cover overhead and profit in an arm's-length sale.

A close examination of the figures submitted by the petitioner reveals, however, that the Customs formula was not always applied correctly. In some years, the markups were applied to some costs which were general expenses, and in at least 1 year, not all of the materials and production costs were included in the computation. Only in 1967 and 1968 is it apparent that all of the costs of materials and production, and only those costs, were included in the costs to which the markups were applied, and in such years, the average profit of Carla Trading was 11.6 percent of its total costs. There is nothing to indicate that Carla Trading's average profit would have been greater for the year 1966 if the Customs markups had been properly applied, although Carla Trading should receive a somewhat higher profit for 1963 and the first 4 months of 1964 because of the higher Customs markup then

applicable. Moreover, the average profit which should be allowed to Carla Trading must be adjusted to take into consideration certain advantages which it had, namely, the expertise acquired from Ross Glove concerning the production of gloves and the availability of Ross Glove as a ready market for all production. Such availability relieved Carla Trading of advertising, sales, and similar expenses. Using our best judgment on the basis of the record before us, we find that a reduction equal to 3.5 percent of total costs would take such advantages into account. Sec. 1.482–2(e)(4)(v), Income Tax Regs.; *American Terrazzo Strip Co.*, 56 T.C. 961, 974 (1971); *Pauline W. Ach*, 42 T.C. 114 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899 (1966); *Nat Harrison Associates, Inc.*, 42 T.C. 601 (1964). We, therefore, find that an unrelated party would have sold .the same gloves as Carla Trading sold to Ross Glove at total costs plus 10.4 percent in 1963, total costs plus 8.8 percent in 1964, and total costs plus 8.1 percent in 1966 and 1968. In light of such finding and the lack of any evidence supporting the respondent's determination, we hold that the respondent's adjustment under section 482 with respect to 1963, 1964, 1966, and 1968 is unreasonable and that such adjustment should be recomputed on the basis of the prices that we have found to be arm's length. Sec. 1.482–2(e), Income Tax Regs.

In attempting to justify his various adjustments under section 482 for the period from 1961 through 1969, the respondent has repeatedly referred to the profit ratios of Ross Glove and Carla Trading. A careful examination of such ratios demonstrates that they do not support the contention that Carla Trading was merely used to siphon off the profits of Ross Glove. Serious competition to American-made gloves began in 1955. In the 3 years preceding 1955, Ross Glove's pretax profit averaged approximately 3.3 percent of sales; in 1955, such profit was approximately 2.25 percent, and after 1955, it never exceeded 1.90 percent. In the 1960's, as glove production in the United States became unprofitable, Ross Glove's profits were generally lower than in the late 1950's. The large loss in 1967 was due to the fire in the Philippines, which curtailed Ross Glove's supply of Philippine gloves and shows that the profitability of Ross Glove depended on imports, not domestic production. Apparently, the profit pattern of Ross Glove was generally the result of the unprofitability of manufacturing gloves in the United States, and not of a definite plan to siphon off its profits to Carla Trading. Moreover, as earlier discussed, it would be expected that the profit ratio of a Philippine operation would be higher than that of an American corporation. Yet, the respondent's adjustment would result in an average profit ratio of approximately 3.8 percent of sales for Ross Glove and only 4.32 percent for Carla Trading.

## 4. *Deductibility—TeWinkel Family Travel*

The fourth issue is whether certain travel expenses of Mr. TeWinkel and his family are deductible, in their entirety, by Ross Glove. From 1960 through 1962, Mr. TeWinkel was manager of the Carla Trading Plant in the Philippines, and while in the Philippines, he was responsible for the inventory investment of Ross Glove and the sewing operations of Carla Trading. Ross Glove paid a percentage of his salary, and Carla Trading paid the remainder of such salary. Ross Glove also agreed to pay all the travel expenses of Mr. TeWinkel and his family for one vacation trip to Wisconsin. The respondent recognizes that the travel expenses are ordinary and necessary business expenses; but he contends that the deduction of Ross Glove should be limited to 28.5 percent of the travel expenses and that the other 71.5 percent is an expense of the Philippine operation. His proposed limitation is based on the respondent's determination that Ross Glove paid only 28.5 percent of Mr. TeWinkel's annual salary and that Carla Trading paid 71.5 percent.

We must reject the respondent's position. Ross Glove agreed to pay a portion of Mr. TeWinkel's salary and all the travel expenses of one trip home for the TeWinkel family. It was not simply agreed that Ross Glove would pay a portion of his salary and Carla Trading another portion. The respondent has not suggested that there was no business purpose for Ross Glove agreeing to pay all the home travel expenses, or that the sole purpose of such agreement was tax avoidance. Indeed, Mr. Ross testified that the providing of home leave and corresponding reimbursement is normal for executives in distant posts. We see no reason for setting aside the agreement between Ross Glove and Carla Trading and no reason for allowing Ross Glove to deduct only a portion of such home leave expenses. Accordingly, we hold that the travel expenses are deductible in their entirety by Ross Glove.

## 5. *Fraud*

The final issue for decision is whether the fraud penalty is applicable with respect to Mr. Ross for the years 1961 through 1969.

The presumption of correctness attributed to the Commissioner's deficiency determinations does not apply to the findings of fraud. Steiner v. Commissioner * * *, 350 F. 2d 217, 224 (7th Cir. 1965) ; Mensik v. Commissioner * * *, 328 F. 2d 147, 150 (7th Cir.), cert. denied, 379 U.S. 827 * * * (1964). This is a question of fact which the Commissioner * * * [has] to establish by clear and convincing proof, Steiner v. Commissioner * * *, 350 F. 2d at 220 * * * [*Gromacki* v. *Commissioner*, 361 F. 2d 727, 730 (C.A. 7, 1966), affirming a Memorandum Opinion of this Court.]

What the respondent must show by clear and convincing proof may be summarized as follows:

The term "fraud" means actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed and the courts will not sustain findings of fraud upon circumstances which at the most create only suspicion. * * * [10 Mertens, Law of Federal Income Taxation, sec. 55.10, p. 46 (1970 rev.) ; fns. omitted.]

We hold that the respondent has failed to prove by clear and convincing proof that Mr. Ross committed fraud. Contrary to the respondent's contention, the evidence does not show that Mr. Ross ignored or misinformed his attorneys or accountants. Two of his accountants testified at trial and their testimony indicated a rather complete knowledge and general approval of the operation of Carla Trading and the arrangements in the Philippines. In 1962, an agent of the respondent audited the individual petitioners for the years 1958 through 1960 and Ross Glove for the years 1959 and 1960. During discussions with the agent, Mr. Ross fully disclosed the operation of Carla Trading and the arrangements in the Philippines. The agent did not challenge such operation and arrangements, and in his report the agent described Carla Trading as operating the glove-manufacturing plant in the Philippines. Similarly, we have held that the income of the Philippine operation was the income of Carla Trading.

The respondent contends, however, that Mr. Ross had a plan to evade Federal income taxes, and points to the different representations made in the Philippines and in the United States, Mr. Ross' allegedly personal use of the profits of Carla Trading, and the incorporation of Carla Trading in a "tax haven" country. It is clear that the representations made by Mr. Ross in the Philippines differed from those made in the United States, but it is also apparent that those made in the United States, for the most part, accurately reflected the true state of affairs. In any event, there has been no showing that Mr. Ross ever intended to mislead the respondent, and his 1962 discussions with the respondent's agent show that he fully disclosed the nature of his operations. The alleged personal use of funds by Mr. Ross simply did not take place. The bank accounts in the Philippines were those of Carla Trading and were not used for Mr. Ross' personal benefit. Mr. Ross' children were stockholders of Carla Trading, and the findings of fact clearly show the bona fide nature of the advances which he made to his mother on behalf of his children and the repayment of such amounts to him out of Carla Trading dividends on which his children paid Federal income taxes. As manager of the children's property, Mr. Ross pledged their stock as collateral for loans which

benefited Carla Trading. Mr. Ross' attorneys did not suggest that a formal guardianship was needed, and we reject the respondent's contention that the lack of a guardianship indicates that Mr. Ross owned all of the Carla Trading stock and personally received and used the dividends from such stock. It is also clear the establishment in a "tax haven" country of a bona fide corporation with a valid business purpose cannot be considered to be an indication of fraud on the part of Mr. Ross.

The respondent further argues that Mr. Ross took deductions that he knew were not allowable with respect to a guest cottage. The evidence indicates that Mr. Ross' attorneys believed that it was doubtful that Mr. Ross could amortize the cost of such cottage over a period as short as 10 years but that Mr. Ross desired to so amortize the cost in order to be able to negotiate with the respondent. Such evidence does not clearly and convincingly show actual intentional wrongdoing on the part of Mr. Ross or that he intended "to evade a tax believed to be owing."

In their petition, Mr. and Mrs. Ross did not challenge the respondent's determination that they were liable for additions to the tax by reason of their failure to pay estimated taxes under section 6654(b) for the years 1961 through 1963. They did challenge the addition under section 6651(a) for the year 1963, but they offered no evidence in support of such position; therefore, we must uphold the respondent's determination with respect to the addition to tax under section 6651(a). *Rudolf A. Zivnuska*, 33 T.C. 226, 239 (1959).

*Decisions will be entered under Rule 50.*